Rel: June 26, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

_____

### CR-2023-0654

_____

**Jordaan Stanly Creque**

**v.**

**State of Alabama**

**Appeal from Morgan Circuit Court**
**(CC-11-844.60)**

COLE, Judge.

Jordaan Stanly Creque, an inmate on Alabama's death row, appeals the Morgan Circuit Court's summary dismissal of his Rule 32, Ala. R. Crim. P., petition for postconviction relief.

Facts and Procedural History

Creque, who was employed at Krystal fast-food restaurant, was arrested on August 24, 2011, after confessing to shooting the Krystal manager, Jeffrey Mark Graff, and a coworker, Jessie Jose Aguilar, during a robbery of the restaurant earlier that morning. Creque told police that he planned and committed the robbery with his two friends, Cassandra Eldred, who also worked at Krystal, and Ezekiel Gholston. On August 26, 2011, Creque was appointed two trial counsel. (C. 8.)[1] On November 16, 2011, a Morgan County grand jury returned an indictment charging Creque with three counts of capital murder for the intentional murders of Graff and Aguilar, which were made capital because they were committed during the course of a robbery of both individuals and because the two victims were murdered by one act or pursuant to one scheme or course of conduct, violations of §§ 13A-5-40(a)(2) and (10), Ala. Code 1975, respectively. (C. 8-9.) Creque's trial commenced on September 30, 2013. On October 11, 2013, the jury found Creque guilty on all three counts of capital murder charged in the indictment. On October 14, 2013, after the

_____

[1]"C" refers to the clerk's record in this case. "TC," "TR," and "STR" refer to, respectively, the clerk's record, the reporter's transcript, and the supplemental record from Creque's trial.

penalty phase, the jury recommended that Creque be sentenced to death by a vote of 11 to 1. On January 15, 2014, the trial court sentenced Creque to death in accordance with the jury's recommendation. This Court affirmed Creque's convictions and sentence on direct appeal on February 9, 2018. Both the Alabama Supreme Court and the United States Supreme Court denied Creque's petitions for a writ of certiorari. On September 21, 2018, the certificate of judgment was entered.

Creque timely filed a Rule 32 petition on September 12, 2019, and his filing fee was paid the next day. On July 23, 2020, counsel entered their appearance on behalf of Creque. On November 24, 2020, Creque filed an "amended" Rule 32 petition, which counsel stated was not a true "amendment" but was merely a resubmission of Creque's original petition in "a form that complies with the procedural requirements of Rule 32." (C. 169.) On November 1, 2021, Creque filed an "Amended Petition."[2] On June 10, 2022, the State filed an answer and a motion for summary dismissal of Creque's petition. (C. 581-683.) Creque filed a reply to the

---

[2]The State refers to this November 1, 2021, petition as the "second amended" Rule 32 petition, but this Court will simply refer to Creque's "Amended Petition" as the "petition" because, as Creque recognizes, it is the "operative pleading."

3

State's request for summary dismissal. (C. 687-761.) The circuit court subsequently issued an order summarily dismissing Creque's amended Rule 32 petition, finding that Creque's claims were insufficiently pleaded, without merit, or both. (C. 764-85.) This appeal follows.

The facts of Creque's crimes were set forth in this Court's opinion affirming Creque's convictions and sentences on direct appeal:

> "Creque admitted at trial that he and two friends, Cassandra Eldred and Ezekiel Gholston, made a plan to steal money from the Krystal fast-food restaurant where Creque and Eldred were employed. Creque purchased a 9mm handgun and ammunition on August 23, 2011, the day before the murders. In the early morning hours of August 24, 2011, Eldred drove the two men to the restaurant. Creque had been scheduled to work the overnight shift but had failed to do so. Two employees were working at the restaurant that morning -- Graff, the manager, and Aguilar. Creque got Graff's attention by knocking on the drive-thru window, and Graff opened the side door to let him in. Creque and Gholston rushed into the restaurant; Gholston was armed with Creque's 9mm gun. They gathered money from the cash registers, and they took the money from the store's safe, which Creque had forced Graff to open. Graff attempted to diffuse the situation and told Creque and Gholston that they could leave and he would wait 10 minutes before he called the police. Creque and Gholston planned to force Graff and Aguilar into the restaurant's cooler. Graff asked if he could get a jacket for Aguilar, and he was allowed to do so.
>
> "Creque gave a statement to the police on the morning of the murders, and he admitted that he had intentionally shot and killed both men. At trial Creque admitted that he shot Graff, but claimed it was unintentional and that he had

4

fired the shot while wrestling over the cooler door with Graff, who was pulling on the cooler door in an attempt to keep it closed. Creque shot Graff one time, in the neck; the bullet pierced his spinal column, and he was paralyzed immediately. Aguilar was shot four times. Creque alleged at trial that after he shot Graff, Gholston took the gun from him and shot Aguilar. Both men died at the scene. Eldred drove them from the scene, and the three divided the money.

"Creque went to the apartment he shared with his girlfriend, Brittany Orr. Creque put his share of the stolen money in a stereo speaker, and he told her that someone had been shot at the restaurant. He was not injured when he arrived at the apartment but, while at the apartment, with the intention that it would appear that he had been assaulted and forced to take part in the crimes, he cut himself with a razor on his arms and chest and had [Brittany] hit him on the head and chest with a can of peaches. [Brittany] and Creque went to the emergency room. A nurse contacted the police after Creque told medical personnel that he had been assaulted by men who had shot one or more employees at a fast-food restaurant.

"Creque was interviewed at the hospital by police officers as a possible witness to the shootings at the restaurant. He initially told the lead investigator, [Det.] Rick Archer, that he had been riding around with 'Taurus,' 'Quincy,' and 'Wodie,' and that he had been showing them the gun he had purchased earlier that day. He said that they had taken his gun, tortured him, and had forced him to take part in their plan to steal money from the restaurant. However, when the police received additional information from officers investigating the crime, including the fact that Gholston had been at the restaurant, [Det.] Archer presented that information to Creque and, [Det.] Archer said, Creque's story 'evolved' to account for that information. In Creque's final version of the events, he said that he, Gholston, and Eldred had planned the robbery and that Eldred drove them to and

5

from the restaurant. He described the crime in detail and admitted that he intentionally shot Graff and Aguilar.

"The police recovered cash from Eldred's residence and from the apartment Creque shared with [Brittany]. Gholston led the police to a lake where he had disposed of the gun Creque had purchased, and forensic testing established that the recovered gun was the one from which the fatal shots were fired.

"The trial court instructed the jury on the three counts of capital murder charged in the indictment. The court also instructed the jury on felony-murder and robbery as lesser-included offenses. The jury found Creque guilty of the three counts of capital murder as charged in the indictment.

"At the penalty phase, Creque presented a variety of evidence offered as support for the imposition of a sentence of life imprisonment without the possibility of parole, including: testimony about his chaotic upbringing that included physical and emotional abuse; evidence about his learning disabilities, educational deficiencies, and the lack of appropriate parental role models; evidence of his chronic abuse of drugs and alcohol; and evidence that he had sustained numerous concussions and other physical injuries during his childhood. The jury recommended that the trial court sentence Creque to death, and the trial court imposed the death sentence."

Creque v. State, 272 So. 3d 659, 673-74 (Ala. Crim. App. 2018) (footnote

omitted).

6

Standard of Review

In <u>Belcher v. State</u>, [Ms. CR-2023-0206, June 26, 2026] ___ So. 3d ___ (Ala. Crim. App. 2026), this Court set forth the standard that we use to review a postconviction petition as follows:

"It is well settled that a circuit court may summarily dismiss a postconviction petition pursuant to Rule 32.7(d), Ala. R. Crim. P.,

"'[i]f the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings ....'

"See also <u>Hannon v. State</u>, 861 So. 2d 426, 427 (Ala. Crim. App. 2003); <u>Cogman v. State</u>, 852 So. 2d 191, 193 (Ala. Crim. App. 2002); <u>Tatum v. State</u>, 607 So. 2d 383, 384 (Ala. Crim. App. 1992).

"'"[W]here there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, '[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.'" <u>Boyd v. State</u>, 913 So. 2d 1113, 1122 (Ala. Crim. App. 2003) (quoting <u>Elliott v. State</u>, 601 So.2d 1118, 1119 (Ala. Crim. App. 1992)). However, "when the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." <u>Ex parte White</u>, 792 So. 2d 1097, 1098 (Ala. 2001). "The sufficiency of pleadings in a Rule 32 petition is a question of law" and is reviewed

7

"'de novo.'"  Ex parte Beckworth, 190 So. 3d 571, 573 (Ala. 2013) (quoting Ex parte Lamb, 113 So. 3d 686, 689 (Ala. 2011)). Moreover, when a trial court makes its judgment "based on the cold trial record," we apply a de novo standard of review. Ex parte Hinton, 172 So. 3d 348, 352 (Ala. 2012).'

"Harris v. State, 365 So. 3d 1075, 1089 (Ala. Crim. App. 2021).

"Some of [Creque's] claims were summarily dismissed on the ground that they were insufficiently pleaded.

"'Rule 32.3, Ala. R. Crim. P., states that "[t]he petitioner shall have the burden of pleading ... the facts necessary to entitle the petitioner to relief." Rule 32.6(b), Ala. R. Crim. P., states that "[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." As this Court noted in Boyd v. State, 913 So. 2d 1113 (Ala. Crim. App. 2003):

"'"'Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So. 2d 364, 406 (Ala. Crim. App. 1999). In other words, it is not the pleading of a conclusion 'which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 So. 2d 1370, 1373 (Ala. Crim. App. 1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle

8

the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged facts."

"'913 So. 2d at 1125.

"'"The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So. 2d 724 (Ala. Crim. App. 2003)."

"'Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006).

"'"Although postconviction proceedings are civil in nature, they are governed by the Alabama Rules of Criminal Procedure. See Rule 32.4, Ala. R. Crim. P. The 'notice pleading' requirements relative to civil cases do not apply to Rule 32 proceedings. 'Unlike the general requirements related to civil cases, the pleading requirements for postconviction petitions are more stringent....' Daniel

9

> > v. State, 86 So. 3d 405, 410-11 (Ala. Crim. App. 2011). Rule 32.6(b), Ala. R. Crim. P., requires that full facts be pleaded in the petition if the petition is to survive summary dismissal. See Daniel, supra. Thus, to satisfy the requirements for pleading as they relate to postconviction petitions, Washington was required to plead full facts to support each individual claim."
>
> > "'Washington v. State, 95 So. 3d 26, 59 (Ala. Crim. App. 2012). "The pleading requirements of Rule 32 apply equally to capital cases in which the death penalty has been imposed." Taylor v. State, 157 So. 3d 131, 140 (Ala. Crim. App. 2010).'
>
> > "Harris, 365 So. 3d at 1089-90."

___ So. 3d at ___. In addition, "[s]ummary disposition is also appropriate when the petition is obviously without merit or where the record directly refutes a Rule 32 petitioner's claim." Lanier v. State, 296 So. 3d 341, 343 (Ala. Crim. App. 2019).

Moreover, "'[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.'" Brownlee v. State, 666 So. 2d 91, 93 (Ala.Crim.App.1995) (citation omitted).

> > "Finally, '[w]ith certain exceptions not applicable here, "this Court may affirm the judgment of the circuit court for any reason, even if it is not for the reason stated by the circuit

10

court."' Harris [v. State], 365 So. 3d [1075,] 1091 [(Ala. Crim. App. 2021)] (quoting Acra v. State, 105 So. 3d 460, 464 (Ala. Crim. App. 2012))."

Belcher, ___ So. 3d at ___.

Analysis

Creque asserts on appeal that the circuit court erred by summarily dismissing the following five general claims in his petition: that trial counsel were ineffective during the guilt phase for failing to "effectively marshal evidence of [his] intoxication and mental state," that trial counsel ineffectively "handle[d] jury selection and juror misconduct," that trial counsel provided ineffective assistance during the penalty and sentencing phases of his trial, that trial counsel were constitutionally ineffective "in myriad other ways," and that the circuit court committed numerous legal errors in summarily dismissing his petition. (Creque's brief, pp. 25, 46, 59, 88, 91.) None of these arguments entitle Creque to relief.

Before addressing Creque's claims on appeal, we note that the majority of his arguments on appeal concern claims that the circuit court erroneously dismissed his multiple ineffective-assistance-of-counsel

claims without an evidentiary hearing. In considering Creque's ineffective-assistance-of-counsel claims, we apply the following well-settled legal principles:

> "'"To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

> "'"'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged

action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'

"'"Strickland, 466 U.S. at 689.

"'"'[T]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S. Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ("We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately."). We recognize that "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." Strickland, [466 U.S. at 693,] 104 S. Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. ...'

"'"Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir. 2000) (footnotes omitted).

13

"'"An appellant is not entitled to 'perfect representation.' Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). '[I]n considering claims of ineffective assistance of counsel, "we address not what is prudent or appropriate, but only what is constitutionally compelled."' Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)."

"'Yeomans v. State, 195 So. 3d 1018, 1025-26 (Ala. Crim. App. 2013). ...

"'We also recognize that when reviewing claims of ineffective assistance of counsel "the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." Strickland v. Washington, 466 U.S. 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).'"

Belcher, ___ So. 3d at ___ (quoting Marshall v. State, 182 So. 3d 573, 582-83 (Ala. Crim. App. 2014)).

"In determining whether a petitioner was prejudiced by any deficient performance,

"'"'a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ... In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."'"

Belcher, ___ So. 3d at ___ (quoting Gaddy v. State, 952 So. 2d 1149, 1171 (Ala. Crim. App. 2006), quoting in turn Wiggins v. Smith, 539 U.S. 510, 534 (2003), quoting in turn Strickland v. Washington, 466 U.S. 668, 694 (1984)).

With these principles in mind, we review Creque's arguments on appeal.

## I.    Ineffective Assistance Regarding Intoxication/Mental State

Creque first contends, as he did in his petition, that trial counsel rendered ineffective assistance by failing to "effectively" present evidence of his intoxication and mental state at the time of his confession and at the time of the offenses.  More specifically, Creque argues that his trial counsel failed to "effectively" challenge the admissibility of his confession, failed to "adequately" argue that the confession should not be believed, and failed to argue that he lacked the specific intent to kill based on his intoxication and mental state at the time of the offenses.

### A.    Motion to Suppress

Creque first argues that trial counsel provided constitutionally ineffective assistance in moving to suppress his statements.

This Court addressed Creque's preserved argument on direct appeal that "the trial court erred when it denied his motion to suppress his statements." Creque, 272 So. 3d at 675. After a thorough analysis, this Court rejected Creque's underlying, substantive claim that his motion to suppress was erroneously denied. Id. at 675-88. Creque argued at trial and on direct appeal that the statements he provided at the hospital were inadmissible because he was not Mirandized[3] and "that the post-waiver statement was involuntary because, he says, he was under the influence of Ativan and the drugs and alcohol he had ingested before he went to the hospital and he was coerced." Id. at 675, 679. Creque also argued that "he was 'drowsy and incapacitated' at the police station when [Det.] Archer went over his statement with him." Id. at 679. This Court rejected each of Creque's arguments. We held that "the trial court here correctly determined that Creque was not in custody when he spoke to [Det.] Pinion, and that [Det.] Pinion was not required to advise Creque of his Miranda rights before questioning him about what had happened." Id. at 679. We then rejected Creque's contentions that his statements

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

16

were involuntary based on his use of drugs and alcohol and the shot of Ativan he received at the hospital. As this Court explained:

> "Creque … was not so impaired as to make him unconscious of the meaning of his words so as to render his <u>Miranda</u> waiver or his statement involuntary. To the contrary, it is clear from the testimony and from Creque's own statement that he was so alert and so aware of the circumstances and the meaning of his words that he adjusted his version of events to respond to [Det.] Archer's questions and comments about information from the investigation that conflicted with what Creque had initially told [Det.] Archer. Furthermore, Creque did not request that [Det.] Archer stop the review of his written statement because he was tired and incapable of continuing, and he engaged in further discussion with [Det.] Archer about certain details of the statement and wrote additional information on the statement at the conclusion of the review of the written statement."

<u>Id.</u> at 684. This Court also rejected Creque's contention on direct appeal that his statement was involuntary because of the combined effects of alcohol, drugs, and sleep deprivation. "Having reviewed the videotape, this Court agree[d] with the trial court's determination that Creque was obviously tired and sleepy, but not to the degree that rendered his statement involuntary." <u>Id.</u> at 685.

In sum, we held that,

> "[c]onsidering all of Creque's arguments as to the voluntariness of his <u>Miranda</u> waivers and statements in light of the totality of the circumstances, … the trial court did not

17

err in ruling that Creque's statements were voluntary, so they were properly admitted into evidence."

Id. at 686.

Creque's postconviction claim that trial counsel were ineffective in moving to suppress his statements was likewise properly dismissed. See Lee v. State, 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009) ("Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective" based on his alleged deficient presentation of this motion.). Although Creque's petition asserts that other experts would have been more effective in showing how Creque's statements to authorities may have been influenced by his consumption of alcohol and different controlled substances, he failed to sufficiently plead information that his statements would have been inadmissible considering the circuit court's review of other evidence already presented, including its review of Creque's confession itself. Moreover, because the motion to suppress was properly denied, the timing of the meritless motion could not result in constitutionally ineffective assistance. In short, Creque pleaded no facts that would even suggest a reasonable probability of prejudice -- that either the trial court's or this Court's merits analysis would have been

different had the trial court been given more time to consider the motion. See, e.g., Wilson v. State, [Ms. CR-21-0109, Aug. 22, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025) ("Although Wilson makes the bare allegation that, if his counsel had 'timely' filed the motion, then 'the motion would have been granted,' Wilson does not plead any facts as to how the trial court's merits analysis would have differed had his counsel filed the motion earlier."). Likewise, although the State's mentioning Creque's confession in opening statements may have been prejudicial had the confession been held to be inadmissible, no prejudice could have resulted because the confession was properly admitted at trial. Creque's allegations were insufficiently pleaded because he pleaded no facts that, if true, show a reasonable probability that, but for counsel's alleged untimeliness, the result of Creque's trial would have been different, particularly because the underlying substantive claims were without merit.

To the extent that Creque contends on appeal that "[i]t violates the Sixth Amendment for counsel to wait until the middle of trial to come up with a defense theory" (Creque's brief, p. 34), that claim is deemed waived because it does not satisfy the requirements of Rule 28(a)(10), Ala. R.

19

App. P. <u>See, e.g.</u>, <u>Woodward v. State</u>, 276 So. 3d 713, 746 (Ala. Crim. App. 2018) (holding that Woodward's argument was waived because he "reassert[ed] this claim from his petition, but he made no argument regarding why he believe[d] the circuit court's findings were incorrect"). Furthermore, to the extent that Creque argues that trial counsel could not prepare for trial until they knew that Creque's confession would be admitted into evidence, it is clear that counsel had to prepare for trial with the assumption that the confession would be admitted into evidence for the jury's consideration at least until a suppression motion was filed and the trial court made a ruling. Thus, the trial court's mid-trial ruling that the confession was admissible could not have changed counsel's strategy that was necessarily in place at least until the suppression motion was filed. Although Creque cites two cases from other circuits, Creque does not cite to the trial record or make any argument on appeal in support of this claim and what alternative theory he believed counsel failed to make, much less explain how counsel's failure to pursue such a theory prejudiced him. Later, in providing a laundry list of the additional "myriad other ways" that counsel were ineffective, Creque states that his counsel should have "present[ed] an alternative theory that Gholston was

20

the real shooter of both victims." (Creque's brief, p. 89.) However, again, Creque offers no argument but merely cites allegations in his petition that Gholston allegedly "had far more motive to commit a robbery" and that a witness, Justin Creque, could have testified that Gholston suggested to Creque that they should "hit a lick." (C. 426, 454.) Neither allegation, however, supports a theory that Gholston was the real shooter, especially in light of Creque's pretrial (and properly admitted) confession that he shot both victims, as well as his trial testimony that he shot Graff.

Moreover, the circuit court properly dismissed this claim because it was both insufficiently pleaded and without merit. Because the evidence against Creque -- Creque's detailed confessions and ample corroborating evidence -- was overwhelming, there was no reasonable probability that a defense theory that contradicted Creque's confessions and argued that Gholston was the shooter of both victims would have resulted in a different outcome.

The defense "theory of the case at trial was that [Creque] shot only Graff and that he did so accidentally." Creque, 272 So. 3d at 698. That theory could be reconciled with Creque's admissible confession, but the

21

theory proffered in Creque's Rule 32 petition and on appeal cannot. The defense theory pursued at trial was not "unreasonable," particularly given Creque's own admissions. Creque's alternative postconviction theory that Gholston was responsible directly contradicted Creque's confession, and, thus, counsel could not be ineffective for failing to present a theory contradicted by Creque's own confession, which this Court held was properly admitted on direct appeal and which was amply corroborated at trial. Even at trial, Creque acknowledged going to Tucker's Gas Station and Pawn Shop to buy a pistol on August 23, 2011. Creque was convinced to join Gholston in the robbery because they had a "greater chance" with Creque's gun and because Creque "knew the ins and outs" of Krystal. (TR. 2280-81.) Creque testified that he was "convinced" only because he was going to merely "stand at the door and watch guard." (TR. 2281.) However, Creque admitted that he loaded the gun with bullets. (TR. 2349.) Creque acknowledged shooting Graff, although he claimed that it was an accident that occurred when Graff was trying to get out of the cooler. (TR. 2293-94.) However, Creque also testified that Graff had "grabbed [Aguilar] a jacket" on their way to the cooler, indicating that Graff was complying with going in it and not going

22

to try to prevent going in. Creque and Gholston ran from the scene after Aguilar was shot and then split the money between themselves and Eldred. (TR. 2293-96.) Creque admitted throwing his clothes and shoes and bandana in a dumpster. (TR. 2303.) Creque admitted he "c[a]me up with a story that would pretty much cover what took place." (TR. 2306.) Brittany Orr drove him to the hospital, and he indeed "told [the nurses] that [he] had been beaten up and knew something about [what had happened] at Krystal." (TR. 2307.) Creque said that his initial story involved Taurus and "Quincy and … [his] being forced to commit a robbery." (TR. 2309.) He also admitted that, before that story, he had told Eldred and Brittany Orr that he had helped Gholston with the robbery, but that Gholston had shot two people. Creque hid money in the stereo speaker in Megan Orr's apartment, where he lived. Creque admittedly cut himself before going to the hospital to corroborate the story that he was forced to participate in the robbery. (TR. 2297, 2309, 2305.) Brittany also testified that she helped injure him to corroborate his "story." Moreover, trial counsel bolstered Creque's trial testimony with the testimony of "Janice Johnson, a self-employed crime-scene analyst who had experience in crime-scene reconstruction." Creque, 272

23

So. 3d at 698. On direct appeal, this Court recounted how Johnson's testimony supported Creque's accidental-shooting theory and how trial counsel relied upon it in the guilt-phase closing argument. Id. at 698-700.

In sum, "because the chosen theory of defense [accidental shooting of Graff] was reasonable, 'it is immaterial that some other reasonable courses of defense … existed.'" Brooks v. State, 929 So. 2d 491, 503 (Ala. Crim. App. 2005) (quoting Chandler v. United States, 218 F.3d 1305, 1316 n.16 (11th Cir. 2000)). Moreover, "'the mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory.'" Hunt v. State, 940 So. 2d 1041, 1067 (Ala. Crim. App. 2005) (quoting Rosario-Dominguez v. United States, 353 F. Supp. 2d 500, 513 (S.D.N.Y. 2005)).

Creque also failed to plead facts to show that additional evidence of Creque's alcohol and drug use leading up to the crimes would have changed the result, particularly considering the trial court's finding at trial and this Court's finding on appeal that Creque's statements were admissible. The trial court considered the audio and video recordings of Creque's statements to police and found "no indication … that Mr. Creque

24

was under the influence of any kind of drugs legal or otherwise" (TR. 2065), and, after reviewing those recordings, this Court agreed with the trial court on direct appeal. The trial testimony was that, although Creque was "tired" and "sleepy," none of those circumstances "impact[ed] his ability to make coherent statements." (TR. 2065-66.) In short, "[i]f the court cannot determine whether the petitioner is entitled to relief after considering all of the factual assertions to be true, then the petitioner has failed to meet his burden of pleading pursuant to Rule 32.6(b), Ala. R. Crim. P." Lee v. State, 44 So. 3d 1145, 1156 (Ala. Crim. App. 2009).

Creque also argues that trial counsel "failed to effectively marshal the evidence supporting suppression of [his] statement." (Creque's brief, p. 35.) More specifically, Creque contends that counsel should have elicited lay witnesses to testify about his alcohol and drug use in the hours before the murders. Creque twice contends on appeal that trial counsel was ineffective for failing to "present evidence from lay witnesses about [his] mental state" and for failing to "elicit any evidence at the suppression hearing or trial from the multiple available lay witnesses who observed [him] in the hours leading up to the offense and could have

25

testified about just how intoxicated and sleep-deprived [he] was."
(Creque's brief, pp. 35-36.) Creque, however, makes no arguments on
appeal regarding this contention but merely cites his petition and alleges
in a footnote that Megan Orr, Brittany Orr, Eldred, Gholston, and Taurus
Pickett "could have" testified. Bare contentions without argument do not
satisfy the requirements of Rule 28(a)(10), Ala. R. App. P., and are, thus,
waived. Moreover, this contention was insufficiently pleaded. Although
Creque identified who "could have" been called to testify at his trial, he
never alleged that Pickett or Eldred and Gholston (who were at the time
awaiting their own trials for their participation in the same offenses)
would have testified. Likewise, Creque never contended what any of the
witnesses would have testified regarding any specific amounts of drugs
and alcohol he consumed and when he consumed the drugs and alcohol,
much less that they would have said he was intoxicated (or appeared to
be) around the time of the crimes. Moreover, both Brittany and Megan
testified at Creque's trial about his use of substances, but neither
testified that Creque was or appeared to be intoxicated at or around the
time of the crimes; nor did their testimony even suggest that Creque

26

would have been intoxicated at the time of the crimes. (TR. 1395-1408; TR. 1948.)

Moreover, additional evidence of Creque's alcohol and drug use would have been cumulative, and counsel could not have rendered ineffective assistance by failing to present additional, cumulative testimony regarding his alcohol and drug use, sleepiness, and the Ativan injection he received at the hospital while being treated for his self-inflicted wounds. See, e.g., McWhorter v. State, 142 So. 3d 1195, 1237 (Ala. Crim. App. 2011) (noting that "additional evidence ... would have been cumulative to evidence presented by trial counsel or would have been inconsistent with evidence presented to support trial counsel's reasonable strategy"). Creque testified that the last time he smoked marijuana or anything else before going to the Krystal restaurant was around 12:45 a.m. but that he smoked marijuana and spice and drank a couple of beers at Eldred's place after the robbery and murders and before he went to the hospital. (TR. 2058, 2060.) In his statement to police, Creque talked about "smoking weed" as he and his accomplices planned the Krystal robbery. (TR. 1990.) Det. Archer acknowledged that Creque appeared "drowsy" or "tired" at the police station. (TR. 1985.) In

27

addition, Brittany, Creque's girlfriend at the time, with whom he was living, testified that, around the time of the murders, Creque smoked "a lot of marijuana," often every day" and that he smoked spice "[m]aybe every other day." (TR. 1946.) Creque also consumed alcohol during this time. In addition, Brittany testified that during this time "he wasn't getting much sleep." (TR. 1947-48.) Likewise, Creque later testified before the jury that, around the time of the robbery and murders and on the day of, he had been using both marijuana and spice, a synthetic marijuana," "between six and seven times a day." (TR. 2257-59.) On August 23 and 24, 2011, he was smoking "between six and eight" Spice cigarettes. (TR. 2260.) Creque also testified that he drank an entire case of 24 beers between August 23 and August 24, 2011. (TR. 2260-61.) Creque said that he also had "a couple of shots" of vodka. (TR. 2262.) In addition, Creque said that, on August 23, he "consumed powder cocaine" and took "two Klonopins and … a Xanax bar," as well as some Lortab pills. (R. 2262-64.) Creque further said that, during this period, he would "[t]ypically … get no more than an hour, hour and a half worth of sleep if that" each day. (TR. 2266.) According to Creque, he could not remember going to the hospital on August 24, 2011. (TR. 2268.) And, he could not

recall much that occurred at the hospital or police department. (TR. 2310-15.)

Finally, Creque contends that "counsel's biggest gaffe was hiring" Dr. Jack Kalin, whom he contends was "an unqualified" and "inadequately prepared" expert. Creque then alleges that Dr. Kalin's testimony "<u>arguably</u> harmed [him]." (Creque's brief, p. 38 (emphasis added).) Creque's contention is clearly speculative, and "[s]peculation is not sufficient to satisfy a [postconviction] petitioner's burden of pleading." <u>Mashburn v. State</u>, 148 So. 3d 1094, 1125 (Ala. Crim. App. 2013). In short, "[t]he likelihood of a different result must be substantial, not just conceivable." <u>Harrington v. Ricter</u>, 562 U.S. 86, 112 (2011).

In addition, the record refutes Creque's contentions. Dr. Kalin was a qualified toxicologist -- a forensic toxicologist for nearly 22 years and the "chief of toxicology for the Department of Forensic Sciences" for 9 of those years. (TR. 196, 2352.) Moreover, Dr. Kalin testified that he was "primarily interested in the <u>effects</u> that ... substances have on the people who ingest them" and "all kinds of <u>performance issues</u>." (TR. 2353 (emphasis added).) It is well settled that "'"[d]efense counsel is entitled to rely on the evaluations conducted by qualified ... experts, even if, in

29

retrospect, those evaluations may not have been as complete as others may desire."'" White v. State, 343 So. 3d 1150, 1176 (Ala. Crim. App. 2019) (quoting McMillan v. State, 258 So. 3d 1154, 1177 (Ala. Crim. App. 2017), quoting in turn Darling v. State, 966 So. 2d 366, 377 (Fla. 2007)). Thus, even if another expert had testified on Creque's behalf at his trial (specifically, Dr. Gaylord Lopez, who Creque pleaded would have testified "more" about the effects of the interaction of the various substances Creque said he had ingested before the crimes), Creque pleaded no facts to show how counsel's reliance on Dr. Kalin's assessments rendered counsel's performance deficient, especially considering the record on appeal, the rulings of the trial court that Creque did not appear to be intoxicated or impaired at the time he made his pretrial statements to law enforcement, and the holding of this Court on direct appeal that, after reviewing the audio and video recordings of those statements, the trial court properly admitted Creque's statements. Moreover, as for Creque's arguments that Dr. Lopez was better qualified than Dr. Kalin and "available to testify at the time [of Creque's trial]" (Creque's brief, p. 37), the United States Supreme Court has made clear "that the inadequate assistance of counsel … does not consist of the hiring of an expert who,

30

though qualified, was not qualified <u>enough</u>." <u>Hinton v. Alabama</u>, 571 U.S. 263, 274-75 (2014) (emphasis added). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" <u>Id.</u> at 275 (quoting <u>Strickland</u>, 466 U.S. at 690).

In addition, ample evidence regarding Creque's drug and alcohol use and sleep deprivation was presented at trial, and, contrary to Creque's postconviction contentions, Dr. Kalin testified that Creque was anxious and hyperventilating at the beginning of the audio recording and that he had received Ativan and "felt weird" and was experiencing a "numbing" sensation. (TR. 204.) On the video recording from the police department, Dr. Kalin did not observe the anxiousness, only sleepiness, and he said that Creque was "nodding off repeatedly." (TR. 205, 222.) Nonetheless, Dr. Kalin testified that Creque was "fully cooperative," although he appeared to be "sleepy," which could be an effect of Ativan. (TR. 206.) Dr. Kalin also said that Ativan could cause "memory loss." (TR. 207.) Dr. Kalin then noted that the effects would be less for someone taking that class of drugs regularly. Dr. Kalin even opined that if Creque

31

had consumed other drugs at the time, that would also impact his behavior. (TR. 218, 223.) Dr. Kalin testified that one who had taken Ativan would "probably … not [be] on [his] best form." (TR. 2362.) Dr. Kalin testified that marijuana "can cause hallucinations" and make one "lose track of time and space." (TR. 2363.) Dr. Kalin testified that cocaine and synthetic drugs like Spice can cause anxiety, that drugs like Ativan cause sleepiness, and that "synthetic marijuana" can make someone "very excitable, very unpredictable." (TR. 2358-60, 2364.) Dr. Kalin also opined that the combined effects would be greater than the effect of just one drug and that, "[i]f you had Xanax, alcohol, and Klonopin, you would probably have a very sleepy subject." (TR. 2370.) However, Dr. Kalin testified a sleepy person would not have appeared anxious, which Creque did before the Ativan injection. Dr. Kalin also testified that if a man Creque's size consumed even 24 beers over 24 "evenly spaced" hours, his blood alcohol level would probably be zero at any given time. (TR. 2371-74.) Based on Dr. Kalin's testimony, any additional testimony from another expert, like Dr. Lopez, regarding the effects Creque might have experienced from his alleged alcohol and drug use would have been merely cumulative. Counsel's performance is not constitutionally

32

deficient simply because they could have presented <u>additional</u>, <u>cumulative</u> evidence regarding what the combination of those factors could have had on whether he knowingly, intelligently, and voluntarily waived his rights or whether they affected his intent. <u>See, e.g.</u>, <u>McWhorter</u>, 142 So. 3d at 1237 (noting that "additional evidence ... would have been cumulative to evidence presented by trial counsel or would have been inconsistent with evidence presented to support trial counsel's reasonable strategy").

Furthermore, any possible effects from the combined use of drugs and alcohol were refuted by ample evidence that Creque did not appear "intoxicated" to anyone. For example, the man who sold Creque the gun at the pawn shop mere hours before the robbery and murders was a former EMT, and he testified that Creque had no signs of being "under the influence" of anything and noted that he would have noticed signs such as "pinpoint pupils," "jitteriness," and "faster respirations." The pawn-shop clerk also testified that it would be illegal to sell a gun to an intoxicated person and would result in the business losing its license to sell firearms. (TR. 2400.) Likewise, the medical personnel at the hospital noted in Creque's chart when he reported to the hospital that, in addition

to his wounds appearing to be self-inflicted (indicating Creque was clear thinking enough to plan and execute his strategy, formed immediately after the crimes, to conceal his crimes), Creque was "[a]ppropriate, coherent," "[o]riented … times three [person, place, and time]," and "[a]nxious." (TR. 227.) Notably, "slow to respond," "confused," "aggressive" were not checked on Creque's medical forms. (TR. 228.) Dr. Kalin, after reviewing both the audio and video recordings of Creque's police interview, testified that Creque was both "talkative and quiet," "back and forth" and "not stuttering" and "not slurring his speech" during the audio recording. (TR. 2380-81.) Dr. Kalin also observed "moments of lucidity" in the video recording. (TR. 2383.) Dr. Kalin further testified he would "expect more sedation than excitation" if a person had "ingested Klonopin, Xanax, cocaine, alcohol, herbal marijuana, [and] synthetic marijuana" during a 24-hour period. (TR. 2385.) In sum, no witness indicated that Creque's statements were involuntary or unknowing or unintelligent but only that he was, at most, as Dr. Kalin testified, "sleepy." And, "alleged fatigue is only a factor to be considered … in determining whether" a statement is "voluntary." Grayson v. State, 824 So. 2d 804, 832 (Ala. Crim. App. 1999). Moreover, as already stated, the

trial court found that Creque's statements were admissible after viewing and reviewing all the evidence, and this Court agreed. As in Grayson, "the State presented sufficient evidence that the appellant's statement was knowingly and voluntarily given." Id. at 835. Again, the circuit court properly summarily dismissed Creque's claim because he failed to plead any facts to show that counsel's performance was deficient, much less that, but for counsel's actions, the result would have been different, particularly when the underlying claim is without merit.

We further recognize, as Creque asserts, that "'a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel.'" (Creque's brief, p. 94 (quoting Ex parte Taylor, 10 So. 3d 1075, 1078 (Ala. 2005) (recognizing, however, that "it may be the rare case in which the application of the plain-error test and the prejudice prong of the Strickland test will result in different outcomes").) However, Creque does not address the fact that this Court's review of the denial of his motion to suppress was a preserved claim, and, if the underlying issue is held to be without merit when preserved, it does automatically foreclose

35

a postconviction claim of ineffective assistance in presenting that claim. Creque did plead additional facts that he asserts would have bolstered his position, but he did not plead facts, including proposed testimony from additional experts, sufficient to overcome the trial court's findings, even as to his contentions reviewed for plain error, that Creque's statements were "knowing, intelligent, and voluntary" and thus admissible.

Likewise, Creque pleaded no facts to show that Dr. Kalin's being retained the week before trial and viewing the video recording on the same day prejudiced him because his testimony would have been different if he had additional time. Creque pleaded no facts to show that the timing of Dr. Kalin's employment would have made a difference, particularly considering that Creque's pretrial statements were held to be admissible.

Finally, Creque's contention that counsel was ineffective for waiting "until the middle of trial" to develop a trial strategy is a bare allegation with no factual support. Moreover, Creque also pleaded no facts to show that counsel's strategy was deficient. That Creque accidentally shot Graff and was guilty of felony murder, not capital

murder, was a reasonable strategy based on Creque's trial testimony that he did not shoot Aguilar and only "accidentally" shot Graff. See, e.g., McWhorter, 142 So. 3d at 1237 (noting that "additional evidence ... would have been cumulative to evidence presented by trial counsel or would have been inconsistent with evidence presented to support trial counsel's reasonable strategy").

In sum, some of Creque's contentions were waived on appeal, but, regardless, the circuit court properly summarily dismissed all of Creque's various contentions regarding the alleged ineffective assistance of trial counsel in arguing the motion to suppress because they were either insufficiently pleaded, without merit, or both. This is particularly true because the pleaded facts would have been cumulative and because Creque "pleaded no facts to explain how, if the jury had known this additional information, there is a reasonable probability that [Creque] would not have been convicted or sentenced to death." Belcher, ___ So. 3d at ___.

### B.    Reliability of Creque's Confession

Creque next argues that trial counsel "failed to effectively challenge [the] reliability" of his confession after it was admitted. (Creque's brief,

p. 42.) Specifically, Creque cites one case, <u>Gaddy v. State</u>, 698 So. 2d 1100, 1118 (Ala. Crim. App. 1995), for the proposition that intoxication is a factor to be considered by a jury "in determin[ing] the weight and credibility to be accorded to the appellant's statement." (Creque's brief, p. 42.) Creque then alleges, in full:

> "Among other things, counsel failed to: (1) hire a qualified expert, like Dr. Lopez, who could have opined that, given the substances in Creque's system when he made the statement, it was inherently unreliable; (2) elicit testimony from lay witnesses about Creque's level of intoxication on the night of the crime; (3) effectively point out the specific factual inaccuracies within Creque's confession; or (4) even make effective arguments about the unreliability of the confession which would have demonstrated that it was not to be trusted. <u>Supra</u> at 26-42. This also constitutes ineffective assistance of counsel."

(Creque's brief, p. 43.) Those contentions do not satisfy the requirements of Rule 28(a)(10) and are waived for purposes of appellate review. <u>See, e.g.,</u> <u>Calhoun v. State</u>, 261 So. 3d 457, 472-73 (Ala. Crim. App. 2016) (holding that Calhoun failed to "adequately argue" his ineffective assistance contentions on appeal because he "merely restate[d] these allegations from his petition" and failed to cite "legal authority to support these contentions"), and <u>Woodward v. State</u>, 276 So. 3d 713, 746 (Ala. Crim. App. 2018) (holding that Woodward's argument was waived

38

because he "reassert[ed] this claim from his petition, but he made no argument regarding why he believe[d] the circuit court's findings were incorrect").

Moreover, we have already addressed why each of those contentions is insufficiently pleaded and without merit. That Dr. Lopez would have provided more favorable opinions does not render counsel ineffective, particularly because Creque's statements were ruled admissible by the trial court, that ruling was affirmed on direct appeal, any opinion on the unreliability of those statements would have been based on speculation as to how much alcohol and drugs Creque ingested before the crimes, and multiple witnesses testified that Creque did not appear to be anything other than somewhat "anxious" at first and later "sleepy." Creque failed to plead facts to show that testimony from other witnesses would have overcome the opinions of the multiple witnesses, including medical professionals, who saw nothing but some initial anxiety and then sleepiness in Creque shortly after the crimes. Counsel could not be deficient for failing to make a losing argument. Creque also failed to plead how pointing out the inconsistencies would have changed the outcome of the proceedings to a reasonable probability. Indeed, counsel

could not be constitutionally ineffective for failing to point out inaccuracies within Creque's highly detailed confession (in an attempt to show he was "under the influence") when doing so would have only emphasized the multiple "stories" Creque had fabricated and that he had injured himself and gone to the hospital in an attempt to escape punishment for his crimes. "'An ineffective-assistance claim does not arise from the failure to present … evidence where that evidence presents a double-edged sword.'" Washington v. State, 95 So. 3d 26, 53 (Ala. Crim. App. 2012) (quoting Reed v. State, 875 So. 2d 415, 437 (Fla. 2004)).

### C.    Specific Intent to Kill

Creque contends that trial counsel failed to argue that, based on the substances he had ingested, he did not have the "requisite mens rea to support a capital murder conviction." (Creque's brief, p. 44.) Creque further contends that "[t]here is no doubt that Creque was entitled to present evidence on this point [that he was too intoxicated to form the specific intent for capital murder] to the jury … and that he was entitled to" an intoxication charge." (Creque's brief, p. 45.) Creque again alleges what Dr. Lopez would have testified to and, again, fails to recognize that his opinions would have been based on speculation and refuted by the

40

record of direct observations of Creque shortly before and shortly after the crimes by others both in person and in reviewing the audio and video recordings of Creque's statements to law-enforcement officers.

The record shows that evidence of Creque's alleged intoxication was before the jury -- Creque testified that he was under the influence of many substances, not just when he gave his statements, but when he arrived at the Krystal restaurant. And, an intoxication instruction was given to Creque's jury. (TR. 2618 ("Intoxication of the Defendant, whether voluntary or involuntary, may be considered by the jury whenever it's relevant to negate an element of the offense charged such as intent.").) Counsel also argued to the jury that "capital murder has to be an intentional murder … an intentional act." (TR. 2571.) Counsel then "plead[ed] with [the jury] to pay special attention to … intent and what intent is and how intent factors into capital murder." (TR. 2572.) Counsel also explained that "if someone unintentionally kills someone during the course of another felony, and robbery is another felony, that that constitutes felony murder but not capital murder." (TR. 2572.) Counsel then argued that "[w]hat [Creque] described from the witness stand is felony murder and not capital murder" and that the jury should

41

return a verdict of not guilty as to the three capital-murder charges. (TR. 2572-73.) Counsel asked the jury to instead find Creque guilty of the two felony murders that he admitted to during his trial testimony. (TR. 2573.) The trial court properly charged the jury on the lesser-included offense of felony murder.[4] (TR. 2605-09, 2614-18.) And, the trial "court's instruction on the distinction between the capital offense of murder during a robbery, which requires a specific intent to kill, and felony murder, which does not require an intent to kill, was clear and concise." Fletcher v. State, 621 So. 2d 1010, 1021 (Ala. Crim. App. 1993).

> "Because the question of intent to kill is the sole and critical distinction between those two offenses, one of which carries a possible penalty of death and one which does not, there is an obvious and significant benefit to a defendant in having the jury instructed that it might consider his intoxication in deciding whether he had a specific intent to kill."

Id. Here, the trial court instructed the jury on both felony murder and intoxication when it told the jury that "[i]ntoxication of the Defendant,

---

[4]We note that, contrary to Creque's brief on appeal, which asserts that "[f]elony murder is still a capital offense under Alabama law" (Creque's brief, p. 46), the law is clear that "'[n]o defendant can be found guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony-murder doctrine.'" Morton v. State, 154 So. 3d 1064, 1080 (Ala. Crim. App. 2013) (quoting Ex parte Woodall, 730 So. 2d 652, 657 (Ala. 1998)).

whether voluntary or involuntary, may be considered by the jury whenever it's relevant to negate an element of the offense charged such as intent." (TR. 2618.) And, Creque's contention that trial counsel should have also requested a manslaughter instruction based on his "intoxication" is "not supported by the evidence," as properly recognized by the circuit court in summarily dismissing this claim. (C. 778.)

> "'Voluntary intoxication and manslaughter as a lesser included offense of intentional murder are interrelated and often overlapping subjects. "Voluntary drunkenness neither excuses nor palliates crime." Ray v. State, 257 Ala. 418, 421, 59 So. 2d 582, 584 (1952). "However, drunkenness due to liquor or drugs may render [a] defendant incapable of forming or entertaining a specific intent or some particular mental element that is essential to the crime." Commentary to Ala. Code 1975, § 13A-3-2. Where the defendant is charged with a crime requiring specific intent and there is evidence of intoxication, "'drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent.'" Silvey v. State, 485 So. 2d 790, 792 (Ala. Cr. App. 1986) (quoting Chatham v. State, 92 Ala. 47, 48, 9 So. 607 (1891)). Consequently, when the crime charged is intentional murder "'and there is evidence of intoxication, the trial judge should instruct the jury on the lesser-included offense of manslaughter.'" McNeill v. State, 496 So. 2d 108, 109 (Ala. Cr. App. 1986) (quoting Gray v. State, 482 So. 2d 1318, 1319 (Ala. Cr. App. 1985)).
>
> "'It is clear that "[a] defendant is entitled to a charge on a lesser-included offense if there is any reasonable theory from the evidence that would support the position." Ex parte Oliver, 518 So. 2d 705, 706 (Ala. 1987). This is true regardless

of "however weak, insufficient, or doubtful in credibility" the evidence concerning that offense. Chavers v. State, 361 So. 2d 1106, 1107 (Ala. 1978). When there is evidence that would support a charge on a lesser-included offense, the defendant is entitled to the charge "even where 'the defendant denies the charge,' Ex parte Pruitt, 457 So. 2d 456, 457 (Ala. 1984), and [where] 'the evidence supporting the defendant's position is offered by the State.' Silvey v. State, 485 So. 2d 790, 792 (Ala. Cr. App. 1986). Accord, Ex parte Stork, 475 So. 2d 623, 624 (Ala. 1985)."  Starks v. State, 594 So. 2d 187, 195 (Ala. Cr. App. 1991).

"'A charge on intoxication should be given if "'there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt'" on the element of intent. Coon v. State, 494 So. 2d 184, 187 (Ala. Cr. App. 1986) (quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir. 1970)). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App. 1984) ("[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis").  An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, Owen v. State, 611 So. 2d 1126, 1128 (Ala. Cr. App. 1992); Crosslin v. State, 446 So. 2d 675, 682 (Ala. Cr. App. 1983), where the defendant denies the commission of the crime, Coon v. State, 494 So. 2d at 187; see Moran v. State, 34 Ala. App. 238, 240, 39 So. 2d 419, 421, cert. denied, 252 Ala. 60, 39 So. 2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28.'"

Lindsay v. State, 326 So. 3d 1, 45-46 (Ala. Crim. App. 2019) (quoting

Fletcher v. State, 621 So. 2d 1010, 1019 (Ala. Crim. App. 1993)).

In <u>Lindsay</u>, this Court rejected the argument that plain error resulted when the trial court failed to instruct the jury on voluntary intoxication and manslaughter because "[t]here were only vague assertions that Lindsay was under the influence of drugs 'around' the time" of the murder. 396 So. 3d at 46. This Court further explained that "'evidence that the defendant ingested alcohol or drugs, standing alone, does not warrant a charge on intoxication.'" <u>Id.</u> (quoting <u>Pilley v. State</u>, 930 So. 2d 550, 562 (Ala. Crim. App. 2005)). Likewise, "'"there must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed <u>at the time the offense was committed</u>."'" <u>Id.</u> (quoting <u>Mashburn v. State</u>, 148 So. 3d 1094, 1126 (Ala. Crim. App. 2013), quoting in turn <u>Lee v. State</u>, 898 So. 2d 790, 838 (Ala. Crim. App. 2001) (emphasis added in <u>Mashburn</u>).

In <u>Ex parte McWhorter</u>, 781 So. 2d 330, 333-34 (Ala. 2000), McWhorter argued

"that he presented evidence indicating he was intoxicated at the time of the killing, that the trial court instructed the jury that evidence of voluntary intoxication can support a finding of a lack of the intent necessary to a finding of capital murder, and that the trial court therefore erred in refusing to instruct

45

the jury on manslaughter, felony murder, and 'intentional murder' as lesser-included offenses."

As in Creque's case, the evidence showed that the crime was "carefully planned and carried out." Id. at 334. And, as in this case, McWhorter divided the stolen property with his accomplices and "hid that property" as well as other evidence of the crime. Id. Similarly, Creque disposed of his clothing and shoes in a random dumpster not at his own apartment and hid the money in a stereo speaker after the crimes. Also, as in this case, McWhorter gave a voluntary and very detailed statement within a day of the crime. Id. at 334-38. Although McWhorter, like Creque, alleged "a lack of memory, on account of intoxication, … he then furnishe[d] detailed information about how the crime was committed." Id. at 338. The Alabama Supreme Court recognized that "[h]is action on the night of the crime is wholly inconsistent with his self-serving statements suggesting he had a diminished capacity." Id. at 339. Thus, the trial court's finding that the evidence was "insufficient to warrant giving instructions on lesser-included offenses" was affirmed because "McWhorter d[id] not point to any evidence indicating he was intoxicated at the time of the commission of the crime," and witnesses noted that he "did not appear to be under the influence of drugs or alcohol" around the

46

time of the crime. Id. Moreover, as for McWhorter's contention that the trial court specifically erred by not giving a manslaughter instruction, the Alabama Supreme Court recognized that "[a]n instruction on manslaughter would have been incompatible with McWhorter's defense." Id. Although McWhorter's contentions were reviewed for plain error on direct appeal, the Alabama Supreme Court explained that "the evidence suggested no reasonable theory that would support a manslaughter charge." Id.

As the circuit court recognized, there was insufficient evidentiary support for a manslaughter charge in Creque's trial. As in Ex parte McWhorter, "the only evidence presented at trial regarding [Creque's] intoxication" was his own self-serving testimony that he had consumed large amounts of drugs and alcohol on the day of the robbery and murders. Id. at 341; (TR. 2050-51, 2259-63.) Creque's testimony was never corroborated other than by Brittany Orr's very vague and general testimony that, around the time of the murders, Creque was using a lot of marijuana and spice and drinking a lot of alcohol. Brittany's testimony did not support any reasonable finding regarding how much Creque had consumed on the day of the crimes (much less at the time of the crimes)

47

or that he was actually intoxicated. (TR. 1946-48.) Cf. Ashley v. State, 651 So. 2d 1096, 1098 (Ala. Crim. App. 1994) (holding that the trial court erred in refusing a manslaughter instruction when two witnesses testified that the defendant appeared to be "high" or "on drugs"). The most specific of Brittany's testimony was that she and Creque and Gholston smoked some "weed" after Creque bought the gun from the pawn shop, but she later testified that she was "not sure" if Creque smoked marijuana the day of the murders. (TR. 1918-19, 1946.) Megan Orr testified that on the night of August 23, 2011, Creque was at her apartment for about "thirty minutes" around 8:00 or 9:00 p.m. and that she and Gholston and Creque smoked one natural marijuana blunt and that no one took any cocaine or pills. (TR. 1407-08.) Neither suggested that Creque was intoxicated the day of the shooting or night before the crimes, much less at the time they were committed. Even Creque's own testimony never stated that he was "intoxicated" at the time of the crimes, much less to the point of "insanity." See, e.g., Ex parte Bankhead, 585 So. 2d 112, 121 (Ala. 1991) ("the intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity"). Indeed, as in Ex parte McWhorter, "[t]he evidence offered by [Creque] as

48

to his alleged intoxication was glaringly inconsistent with his own …

detailed descriptions of the events." 781 So. 2d at 342. (See TR. 2282-2307 (Creque provided a detailed recitation of everything that occurred, from the clothing and shoes he wore, where exactly they parked, explaining to his accomplices how they would get inside Krystal, waiting behind a dumpster, everything that happened inside, running away, splitting the money, getting a change of clothes from Eldred, lying to Eldred and Brittany that Gholston shot both victims, asking Eldred to stop at a dumpster on the way to his and Brittany's apartment so that he could dispose of the clothing and shoes he wore during the crimes, fabricating a story to evade responsibility, faking injuries, and going to the hospital specifically to tell his "story" as a "victim" so that his true involvement would not be suspected).)

In addition, other evidence presented at trial refutes Creque's postconviction claims of intoxication. Creque testified that he arrived at the Krystal at approximately 4:00 a.m. (TR. 2284.) The hospital notified police that Creque had reported to the hospital as a victim of the Krystal robbery at about 5:55 a.m., less than two hours after the crimes. (TR. 1579.) Dr. Thomas Christian treated Creque that morning and tested his

49

functioning by the Glasgow Coma Scale, testifying that Creque scored a 15, which "means you're alert and oriented and in a normal state of mental abilities." (TR. 1740.) Moreover, Dr. Christian testified he "had no reason to believe" that Creque was under the influence of any drug. (TR. 1745.) Creque was merely "anxious that was all," for which Dr. Christian ordered a "mild side of a normal dosage" of Ativan, which Creque was given at 6:33 a.m. (TR. 1738, 1741.) Likewise, Det. Archer testified that Creque "was not impaired at all." (TR. 2143.) Thus, Creque's "self-serving statements suggesting he was intoxicated at the time of the killing … [are], as a matter of law, insufficient to satisfy the rigorous standard of showing that the intoxication relied upon to negate the specific intent required for a murder conviction amounted to insanity." Ex parte McWhorter, 781 So. 2d at 342.

Thus, although the trial court generously instructed Creque's jury on intoxication, giving him the benefit of that instruction combined with the instruction on the lesser-included offense of felony murder, Creque was not entitled to it. "Because there was no substantial evidence indicating that at the time of the crime [Creque] was intoxicated to such a degree that the intoxication amounted to insanity, the trial court's

voluntary-intoxication charge was neither prejudicial nor necessary." Ex parte McWhorter, 781 So. 2d at 343. Likewise, a manslaughter instruction was unwarranted by the evidence because there was "no indication that [Creque] was so intoxicated that he could not form the necessary intent, despite his statement that he had ingested drugs and alcohol before the murder." Hutcherson v. State, 677 So. 2d 1174, 1175 (Ala. Crim. App. 1994) (holding that it was not plain error for the trial court to fail to give a manslaughter charge even though it had given an instruction on intoxication). As this Court held in its plain-error review on direct appeal of Creque's conviction, "Creque [was] not entitled to a holding that the trial court committed plain error when it failed to sua sponte charge the jury on reckless manslaughter" based on his alleged intoxication. Creque, 272 So. 3d at 716. Because Creque was not entitled to a manslaughter instruction and because Creque has pleaded no facts that would show that counsel had other witnesses who could testify to his being intoxicated at the time of the crimes, his trial counsel could not have been constitutionally ineffective for not requesting a manslaughter instruction. In so holding, we recognize that "a finding of no plain error on direct appeal" does not "automatically foreclose" Creque from arguing

51

that he was prejudiced by counsel's failure to present additional evidence that would have supported the giving of a manslaughter instruction. White v. State, 343 So. 3d 1150, 1183 (Ala. Crim. App. 2019). However, as the Alabama Supreme Court recognized, "it may be the rare case in which the application of the plain-error test and the prejudice prong of the Strickland test will result in different outcomes." Ex parte Taylor, 10 So. 3d 1075, 1078 (Ala. 2005). Here, as in White, Creque "has not pleaded any facts whatsoever in his … petition that would show that this is a 'rare case'" in which a different outcome is warranted after the denial of relief under plain-error review. White, 343 So. 3d at 1183. Indeed, Creque never alleged in his petition what witnesses would have testified that he was intoxicated at the time of the crimes. For example, although Creque alleges that "[t]rial counsel also failed to contact Taurus Pickett, who was with Mr. Creque during the relevant time frame when he was drinking" (C. 275), Creque never alleged in his petition what substances Pickett would have testified that Creque had consumed, much less how much he consumed or when he consumed, or that Pickett would testify that Creque was "intoxicated" at or around the time of the crimes. Indeed, Creque wanted to obtain police records to investigate whether there

52

were, "for example, … notations or witness statements regarding Mr. Creque's level of intoxication." (C. 387.) Creque simply did not meet his burden of pleading his contentions regarding his alleged "intoxication" in support of his claim that trial counsel was ineffective for not requesting a manslaughter instruction.

Moreover, even if Creque's trial counsel had been deficient in failing to request an instruction on the lesser-included offense of manslaughter, Creque was not prejudiced by that decision. Creque was charged with three counts of capital murder involving the intentional murder of two individuals during the course of a robbery. The trial court instructed the jury that all three counts of capital murder included the necessary element of an "intent to kill." (TR. 2612.) The trial court also instructed the jury that it should consider the lesser-included offense of felony murder, which involves the unintentional death of an individual "in the course of or in the furtherance of the crime of robbery in the first degree." (TR. 2616.) Following its felony-murder jury charge, the trial court instructed the jury that "[i]ntoxication of the Defendant, whether voluntary or involuntary, may be considered by the jury whenever it's relevant to negate an element of the offense charged such as intent." (TR.

53

2618.) Although Creque's petition does not give the exact content of the manslaughter jury charge that he thinks his trial counsel should have requested, the petition does argue that "an instruction for the lesser included offense of manslaughter is warranted since intoxication can negate the element of specific intent to kill required for a conviction of capital murder." (C. 476.) Yet, Creque does not acknowledge that this is exactly what the trial court's instruction on felony murder did. It allowed the jury to find Creque guilty of the lesser-included offense of felony murder if the jury believed that Creque's level of intoxication prevented him from forming the intent to kill the two victims. In <u>Brown v. State</u>, 623 So. 416, 420-21 (Ala. Crim. App. 1993), this Court addressed the same argument and held that

> "[t]he jury was given the choice of finding the appellant guilty of capital murder, guilty of felony murder, or not guilty of any crime. The jury convicted him of capital murder. 'Therefore, we must logically conclude that an instruction on … [a lesser included offense], although proper, would not have affected the outcome of this case.' <u>Ex parte Jordan</u>, 486 So. 2d 485, 489 (Ala. Cr. App. 1986). Thus, the refusal to instruct on any other lesser included offenses was, at the worst, merely harmless error."

Thus, even if the evidence at trial had warranted a jury instruction on the lesser-included offense of manslaughter, Creque's convictions for

capital murder, not felony murder, make it clear that Creque was not prejudiced by counsel's decision not to request a manslaughter jury instruction.

Finally, to the extent that Creque argues that the myriad alleged errors regarding his alleged intoxication "collectively" violated his right to effective assistance of counsel, that claim was properly summarily dismissed because "Alabama does not recognize a 'cumulative effect' analysis for ineffective-assistance-of-counsel claims." Carruth v. State, 165 So. 3d 627, 651 (Ala. Crim. App. 2014) (citing Mashburn v. State, 148 So. 3d at 1117); see also McWhorter v. State, 142 So. 3d 1195, 1235 (Ala. Crim. App. 2011) ("[A]n aggregate weighing is not required by Alabama law.").

In sum, Creque's various contentions that trial counsel were constitutionally ineffective for not arguing that Creque lacked the specific intent to kill and for not seeking a manslaughter instruction were properly summarily dismissed because they were, as the circuit court found, insufficiently pleaded. See, e.g., Lee v. State, 44 So. 3d 1145, 1156 (Ala. Crim. App. 2009) ("If the court cannot determine whether the petitioner is entitled to relief after considering all of the factual

assertions to be true, then the petitioner has failed to meet his burden of pleading pursuant to Rule 32.6(b), Ala. R. Crim. P."). Likewise, those contentions were refuted by the record and are without merit.

## II.  Ineffective Assistance During Juror Selection/Juror Misconduct

Creque argues that trial counsel rendered constitutionally ineffective assistance by failing to: "(1) make a timely 'Batson'[5] objection, (2) make basic inquiries or strike potentially biased jurors, and (3) address juror misconduct." (Creque brief, p. 47.) Those contentions are also insufficiently pleaded and without merit.

### A. Failure to "Timely" Make a Batson Objection

Creque contends that trial counsel rendered ineffective assistance by failing to "timely object to the State's use of racially discriminatory peremptory strikes under Batson." (Creque's brief, p. 47.) Creque argues on appeal, as he did in his petition, that trial counsel's performance was deficient because: the State used its peremptory challenges to remove five of six prospective Black jurors; Creque, a Black man, was tried for an "interracial crime" by an "all-white jury"; counsel's Batson objection was made after the jury was sworn; and counsel was "unprepared" to argue

---

[5]Batson v. Kentucky, 476 U.S. 79 (1986).

the Batson motion when the trial court belatedly considered it. (Creque's brief, pp. 48-53; C. 407, 417, 447-52.) Notably, although arguing that trial counsel's performance was "deficient," Creque's postconviction counsel has failed to plead any facts in his petition (or even allege any on appeal) that would indicate that an "adequately" argued Batson motion would have been successful. Indeed, the petition and initial brief on appeal are devoid of any contentions suggesting that the State engaged in a pattern of strikes against minority jurors, that the State's reasons for its strikes were pretextual, or that the State engaged in disparate treatment. (Creque's brief, pp. 47-53; C. 407, 417, 447-52.) In other words, Creque pleaded no facts to show a prima facie case of discrimination. No jurors or prospective jurors are even mentioned in either Creque's petition or his initial brief on appeal. In short, Creque pleaded no facts that would suggest any reasonable probability that, but for trial counsel's performance, the result of his proceedings would have been different, particularly considering that Creque's Batson allegations were thoroughly addressed and rejected on direct appeal.

On direct appeal, "Creque argue[d] that the prosecutor's reasons for striking the black veniremembers were pretextual and that the State's

treatment of black veniremembers and white veniremembers were disparate." Creque, 272 So. 3d at 704. Because those particular arguments "were not presented to the trial court," this Court reviewed them on direct appeal for "plain error." Id. at 707-08. However, this Court thoroughly considered the State's proffered reasons for its strikes, and, in addressing the five Black prospective jurors for whom the State exercised peremptory strikes, this Court repeatedly noted that the State's strikes were "race neutral." Id. at 708-10.

Prospective Juror A.B.'s ex-husband had been arrested for drug trafficking, and her nephew had been arrested on drug charges as well. Id. Likewise, Prospective Juror "L.J.'s brother had been convicted of rape and had been sentenced to prison, and his cousin had been convicted of shooting into an occupied dwelling and had been sentenced to prison." Id. at 709. "[T]he exercise of a peremptory strike against a veniremember where a member of his or her family had been arrested is a race-neutral reason." Id. at 708 (citing Townes v. State, 253 So. 3d 447 (Ala. Crim. App. 2015), and Fearn v. City of Huntsville, 568 So. 2d 349 (Ala. Crim. App. 1990)). Moreover, the State had struck "similarly situated jurors of both races," striking those whose family members had been arrested for

"serious crimes." Id. at 708, 709 (citing Wilson v. State, 142 So. 3d 732 (Ala. Crim. App. 2010)). A prosecutor's strike is not pretextual "where there are relevant differences between the jurors who were struck and those who were not struck." Id. at 708 (citing Sharp v. State, 151 So. 3d 342, 363 (Ala. Crim. App. 2010)). The State had explained that it struck Prospective Juror G.P. "because he had been arrested and because he knew a potential witness, Kenny Morrow, who had worked at the Krystal where the murders took place" and who was Brittany Orr's stepfather "and the step grandfather of the children Creque had with Brittany Orr." Id. at 708. "[T]he State's strike was race-neutral because G.P. was not similarly situated to the white jurors." Id. at 709. The State contended that Prospective Juror M.P. was struck "because she gave inconsistent opinions on the death penalty," and, after reviewing the record of voir dire examination, we agreed that her answers regarding imposition of the death penalty "were ambiguous; thus, the prosecutor's strike was race neutral." Id. Similarly, the State struck Prospective Juror T.M. because she "waffled" on whether she could impose the death penalty, and the trial court agreed it "'would have struck her [for that reason] in a heartbeat.'" Id. at 710 (quoting R. 1024). We again agreed that,

"because her answers were ambiguous, ... the strike of T.M. was race-neutral." Id. (citing Mashburn v. State, 7 So. 3d 453 (Ala. Crim. App. 2007)). Moreover, we explained that "[t]he trial court was in a far better position than is this Court to determine matters of credibility, and it had great discretion to distinguish whether the State's explanation for each of its strikes was truthful or pretextual." Id. This Court concluded that "[n]one of Creque's [Batson] allegations of error as to jury selection have merit, and he is not entitled to relief as to those claims. Id. at 710.

In arguing that he is entitled to a new trial because counsel was ineffective for failing to "timely" and "adequately" raise a Batson challenge, Creque relies on Ex parte Yelder, 575 So. 2d 137, 138 (Ala. 1991), for the proposition that prejudice is presumed if trial counsel failed "to make a timely Batson objection when a prima facie case exists of purposeful discrimination by the State in the jury selection process." Creque then alleges that a prima facie case was made by the numbers alone in that "the State removed five of six Black jurors." (Creque's brief, p. 53.) First, "numbers alone" are insufficient "to establish a prima facie case of racial discrimination." Shanklin v. State, 187 So. 3d 734, 766 (Ala. Crim. App. 2014). Cf. Ex parte Thomas, 659 So. 2d 3, 5 n.1 (Ala. 1994)

60

(noting "that a defendant can establish a prima facie case solely on the fact that a prosecutor used a large number of his peremptory challenges to strike black veniremembers"). Second, although the State volunteered reasons for its strikes, a prima facie case of discrimination was not found by the trial court during trial. Creque's circumstances are, thus, easily distinguished from those in <u>Ex parte Yelder</u>, upon which he relies to support this claim.

> In <u>Ex parte Yelder</u>, the Alabama Supreme Court
>
> "adopt[e]d the dissenting opinion of Judge Bowen [in <u>Yelder v. State</u>, 575 So. 2d 131 (Ala. Crim. App. 1990)] and h[e]ld that the failure of trial counsel to make a timely <u>Batson</u> objection to a prima facie case of purposeful discrimination by the State in the jury selection process through its use of peremptory challenges is presumptively prejudicial to a defendant."

575 So. 2d at 139. The Alabama Supreme Court then "reverse[d] the judgment of the Court of Criminal Appeals [based on counsel's alleged ineffective assistance for failing to raise a timely <u>Batson</u> challenge] … and … remand[ed] … to the trial court for a <u>Batson</u> hearing." <u>Id.</u> Creque's reliance on the presumptions of prejudice established by <u>Ex parte Yelder</u> is misplaced for several reasons. In <u>Ex parte Yelder</u>, the <u>Batson</u> claim was raised in a motion for a new trial after the trial had concluded, and a <u>Batson</u> hearing was never

61

held.  See Yelder v. State, 575 So. 2d 131, 137 (Ala. Crim. App. 1990) (Bowen, J., dissenting) ("We do not know yet whether appellant's trial was marred by purposeful racial discrimination, because no Batson hearing was held.").  By contrast, although Creque's Batson challenge was untimely because it was made after the jury was sworn, it was made before any witness testified, and a Batson hearing was, in fact, conducted.  (R. 1017-25).

The trial court found that Creque failed to make a prima facie case of discrimination, but, because the State voluntarily offered reasons for its strikes, the trial court considered those as well and "independently determined that the State's strikes were race-neutral and that the State [was] not required to give its reasons for the strikes, and that when the State then offered its reasons for the record, the trial court put forth additional reasons it found would have supported a race-neutral strike." Creque, 272 So. 3d 659.  In short, the trial court "examined and agreed with the State's strikes before it allowed Creque to make a Batson objection."  Id.  In summarily dismissing this claim in Creque's postconviction petition, the circuit court also found that Creque had failed to plead any facts "to show a prima facie case of discrimination and

fail[ed] to show that the race-neutral reasons provided by the State were pretextual." (C. 772.) This Court also thoroughly considered and rejected Creque's <u>Batson</u> arguments on direct appeal, concluding that there was no purposeful racial discrimination and thus no <u>Batson</u> violation. <u>See</u> <u>Creque</u>, 272 So. 3d at 710 ("We have no basis on which to conclude that the trial court's decision on discriminatory intent was clearly erroneous, so we will not overturn that decision. ... None of Creque's allegations of error as to jury selection have merit, and he is not entitled to relief as to those claims.").

Moreover, the Alabama Supreme Court has made clear "that [the] holding in <u>Yelder</u> does not relieve the defendant of his burden of meeting the first prong of the <u>Strickland</u> test -- a showing of deficient performance by counsel." <u>Ex parte Frazier</u>, 758 So. 2d 611, 615 (Ala. 1999). "If the record does not show a prima facie case of purposeful discrimination, then an appellate court will not assume that the defendant's attorney was ineffective in not making a <u>Batson</u> motion." <u>Id.</u> Thus, counsel's failure to raise a meritless <u>Batson</u> challenge before the jury was sworn could not have resulted in deficient performance under the first prong of <u>Strickland</u> because counsel cannot be ineffective for failing to raise a meritless issue.

See, e.g., McMillan v. State, 258 So. 3d 1154, 1191 (Ala. Crim. App. 2017) ("'Because the substantive claim underling the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.'") (quoting Lee v. State, 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009))).

Finally, to the extent that Creque contends that both his trial and appellate counsel were ineffective for "failing to object" or raise on appeal "the trial court's patently incorrect reasons for rejecting the untimely Batson objection on the merits" (Creque's brief, p. 48), Creque's four-sentence contentions do not satisfy the requirements in Rule 28(a)(10), Ala. R. App. P., and thus those contentions are waived. Moreover, Creque's contentions are not properly before this Court because they were not raised below. See, e.g., Travis v. State, 407 So. 3d 325, 338 (Ala. Crim. App. 2023) ("[T]his Court has held that a Rule 32 petitioner cannot raise on appeal a postconviction claim that was not included in either his original petition or in any of his amendments to his petition." (citing Arrington v. State, 716 So. 2d 237, 239 (Ala. Crim. App. 1997) ("An Appellant cannot raise an issue on appeal from the denial of a Rule 32 petition, which was not raised in the Rule 32 petition."))).

## B. Failure to "Effectively" Question and Strike Jurors

Creque contends that trial counsel rendered ineffective assistance because they "failed to adequately question or strike jurors with obvious biases." (Creque's brief, pp. 53-54.)

We initially note that Creque cites, in a footnote, four jurors or prospective jurors whom he believes were not adequately questioned or struck for cause by his trial counsel -- M.T., A.C., P.F., and W.N. Creque's bare contentions, with no argument or analysis and merely record citations with no citation to any relevant legal authority, do not satisfy the requirements in Rule 28(a)(10), Ala. R. App. P. Thus, those contentions are waived. See, e.g., C.B.D. v. State, 90 So. 3d 227, 239 (Ala. Crim. App. 2011) ("Failure to comply with Rule 28(a)(10) has been deemed a waiver of the issue presented."). Similarly, Creque provides a single-paragraph discussion regarding each of the two specific jurors who served on the jury -- K.T. and R.R. -- whom he believes should have been struck by Creque's counsel based on alleged biases that he cites in the trial record. However, neither of those factual allegations are supported by any caselaw or legal analysis of any kind. (Creque's brief, pp. 54-55.) Creque does not explain why the circuit court's summary dismissal of this

claim was erroneous. Accordingly, Creque's contentions that trial counsel rendered ineffective assistance by not striking Jurors K.T. and R.R. are also waived on appeal for failing to satisfy the requirements in Rule 28(a)(10). See, e.g., Calhoun v. State, 261 So. 3d 457, 472-73 (Ala. Crim. App. 2016) (holding that Calhoun failed to "adequately argue" his ineffective-assistance contentions on appeal because he "merely restate[d] these allegations from his petition" and failed to cite "legal authority to support these contentions").

In addition, Creque's contentions regarding Juror K.T. were insufficiently pleaded. The entire allegation regarding Juror K.T. in Creque's petition was:

> "Additionally, Panel C member K.T. revealed that she had heard 'a lot' about the case prior to trial and had discussed with people what should happen in a trial about the case. When asked if the incident was 'kind of scary to' her, K.T. responded '[y]eah.' (R. 917-18.) Despite these prejudicial responses, Trial Counsel did not make any argument to strike K.T. for cause."

(C. 447.) Creque never alleged what Juror K.T. had heard or what she thought should happen at trial or what additional questions trial counsel should have asked and how Juror K.T.'s answers to those questions would have justified a strike for cause. See, e.g., A.G. v. State, 989 So.

2d 1167, 1173 (Ala. Crim. App. 2007) (holding that ineffective-assistance claims were insufficiently pleaded when petitioner did not plead what questions should have been asked or what the response to those questions would have been). Moreover, although Creque attempts to add additional factual contentions on appeal (for example, that "she lived 'very close' to the crime scene"), those are not properly before this Court because they were not raised in Creque's petition. "[T]his Court has held that a Rule 32 petitioner cannot raise on appeal a postconviction claim that was not included in either his original petition or in any of his amendments to his petition." Travis v. State, 407 So. 3d 325, 338 (Ala. Crim. App. 2023). See also Rule 32.6(b), Ala. R. Crim. P. ("Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.").

Creque's contentions on appeal that trial counsel failed to ask follow-up questions when Juror R.R. "admitted she knew all of the law enforcement witnesses through work and suggested that the prosecution had previously represented her nephew" are insufficiently pleaded. (Creque's brief, pp. 54-55.) Creque alleged in his petition that

> "[J]uror R.R. revealed during voir dire that her nephew was
> the victim of a shooting. (R. 524.) Because Trial Counsel

67

failed to ask follow-up questions of R.R., it was not revealed until after the start of the penalty phase that her nephew had been murdered and that she felt particular sympathy for the victim's family in <u>this</u> case. (R. 2759.) This information was revealed by [Det.] Archer, who was confronted by R.R. outside the court while the trial was still ongoing. [Det.] Archer informed the prosecution that R.R. had approached [Det.] Archer, hugged him, and, within the context of discussing the impact of the case on the families involved, told [Det.] Archer that '[h]aving gone through that before myself, I know how hard it is.' (R. 2759.) R.R. also asked [Det.] Archer questions about the case, which he did not answer. (R. 2760-61.) At the very least, had they performed effectively, Trial Counsel would have learned sufficient information to exercise a peremptory strike to remove a juror who was openly sympathetic to the deceased individuals' families and had a close relative who was murdered. Instead, R.R. was seated on the jury and empowered to help decide Mr. Creque's fate."

(C. 446.) Creque's contentions that counsel should have "asked follow-up questions" after Juror R.R. mentioned her nephew had been shot, should have discovered Juror R.R.'s bias, and should have exercised a peremptory strike to remove her were insufficiently pleaded because he never pleaded what questions should have been asked and what Juror R.R.'s responses would have been. See, e.g., A.G. v. State, 989 So. 2d at 1173 (holding that ineffective-assistance claims were insufficiently pleaded when petitioner did not plead what questions should have been asked or what the responses would have been). Moreover, Creque's contention regarding counsel's not following up during voir dire on Juror

R.R.'s knowing "law enforcement witnesses" is not before us because it was not raised in Creque's petition. See, e.g., Travis, 407 So. 3d at 338, and Rule 32.6(b).

Creque's claims regarding Jurors K.T. and R.R. are particularly insufficiently pleaded considering that the standard for showing that counsel was ineffective for failing to challenge a juror for cause or for failing to exercise a peremptory strike is "actual bias."

> "'"[W]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased." Carratelli v. State, 961 So.2d 312, 324 (Fla.2007). "Because [the appellant's] claim of ineffective assistance of counsel is founded upon a claim that counsel failed to strike a biased juror, [the appellant] must show that the juror was actually biased against him." Miller v. Francis, 269 F.3d 609, 616 (6th Cir.2001) (citing Hughes v. United States, 258 F.3d 453, 458 (6th Cir.2001)). "[The appellant's] claim of ineffective assistance of counsel is grounded in the claim that counsel failed to strike a biased juror. To maintain a claim that a biased juror prejudiced him, however, [the appellant] must show that the juror was actually biased against him." Goeders v. Hundley, 59 F.3d 73, 75 (8th Cir.1995) (citing Smith v. Phillips, 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1981)). [Likewise,] "[t]o show attorney error and prejudice in defense counsel's failure to use peremptory strikes for [biased] veniremen, it is necessary for [the appellant] to show that the veniremen did indeed harbor actual bias against [the appellant]." Parker v. Turpin, 60 F.Supp.2d 1332, 1362 (N.D. Ga. 1999). "Few decisions at trial are as subjective or prone to individual attorney strategy as

juror voir dire, where decisions are often made on intangible factors." Miller, 269 F.3d at 620.

> "'"Because a defendant must demonstrate prejudice in a [post-conviction] proceeding, post-conviction relief based on a lawyer's incompetence with regard to the composition of the jury is reserved for a narrow class of cases where prejudice is apparent from the record, where a biased juror actually served on the jury."

"'Jenkins v. State, 824 So. 2d 977, 982 (Fla. App. 2002).'"

Coan v. State, 322 So. 3d 552, 559 (Ala. Crim. App. 2020) (quoting

Perkins v. State, 144 So. 3d 457, 472 (Ala. Crim. App. 2012)).

Creque pleaded no facts in his petition that show that either Jurors K.T. or R.R. were "actually biased" or that the record suggests that trial counsel's performance was deficient. In addition, Creque's contentions regarding Juror R.R. are without merit because they are based on hindsight. As Creque contends on appeal, "counsel would later admit that he should have struck [Juror R.R.] once her misconduct … came to light." (Creque's brief, p. 55.) In other words, only after Juror R.R. happened to run into Det. Archer during the penalty phase and mentioned that she knew "how hard it is" did Creque wish he had asked more questions during voir dire and struck her. However, "'"[a]n accused is entitled '"not [to errorless counsel, and not [to] counsel judged

70

ineffective by hindsight, but [to] counsel reasonably likely to render and rendering reasonably effective assistance."'"'" Hunt v. State, 940 So. 2d 1041, 1059 (Ala. Crim. App. 2005) (citations omitted).

Moreover, Creque's contentions regarding Jurors K.T. and R.R. are without merit on the face of the record because the facts and allegations do not show "that the potential juror[s] harbored an actual bias against the defendant." Coan v. State, 322 So. 3d at 560. As in Coan, during voir dire, "[t]he potential juror[s] … indicated that [they] believed [they] could be fair and impartial to both sides in this case." Id. Specifically, while Juror K.T. said that she "heard a lot about [the crimes] at first," lived "fairly close," and found the crimes "kind of scary," she also said that she had "forgotten about it," that she had no opinion about Creque's guilt or innocence, and that she could set aside anything she had heard and consider only the evidence. (R. 915-21.) Likewise, although Juror R.R. revealed during voir dire that her nephew was a crime victim and had been shot, she also stated that she could be a fair and impartial juror and consider only the evidence presented during the trial. (R. 484, 634-36.) In addition, Creque's counsel asked the prospective jurors twice if any of them who had been a crime victim or had a family member or close friend

71

who had been a crime victim would "in any way hold that against Creque," and no one responded. (R. 583-84.) "As a result, a challenge to the juror for cause on the ground that they were biased against [Creque] would have been meritless." Coan, 322 So. 3d at 560. "'Counsel is not ineffective for failing to raise a baseless claim.'" Id. (quoting Washington v. State, 95 So. 3d 26, 71 (Ala. Crim. App. 2012)). See also Lee v. State, 44 So. 3d 1145, 1164 (Ala. Crim. App. 2009) (holding that Lee was not entitled to relief based on his claims of ineffective assistance of counsel regarding failure to challenge jurors because "Lee did not allege that any of the jurors were actually biased against him and … the record of the voir dire examination show[s] that the three jurors indicated that they had no bias against Lee nor were they biased in favor of the State").

Furthermore, on direct appeal, this Court held that "[Juror] R.R.'s answers in voir dire were not dishonest or misleading, and they did not indicate any bias in favor of the prosecution." Creque, 272 So. 3d at 690 (emphasis added). (See also R. 484, 583-84, 634-36.) Although we applied a plain-error review to the claim regarding Juror R.R.'s alleged bias in favor of the State on direct appeal, Creque pleaded no facts to show that this was the "rare case" in which application of plain-error review on the

72

underlying substantive claim and an analysis of the prejudice prong of Strickland would yield different results. See, e.g., Ex parte Taylor, 10 So. 3d at 1078 and White, 343 So. 3d at 1183. See also Stallworth v. State, 171 So. 3d 53, 84-85 (Ala. Crim. App. 2013) ("'The attorney's actions during voir dire are considered to be a matter of trial strategy. A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be "so ill chosen that it permeates the entire trial with obvious unfairness."'" (quoting Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir.1995), quoting in turn, Garland v. Maggio, 717 F.2d 199, 206 (5th Cir.1983))).

In sum, Creque's contentions in his petition regarding trial counsel's failure to "adequately" question and "strike" Jurors K.T. and R.R. were waived, insufficiently pleaded, and without merit based on the record. The circuit court thus properly summarily dismissed Creque's claims that counsel provided ineffective assistance during voir dire.

C. Failure to "Adequately" Address Juror R.R.'s Misconduct

Creque contends that trial counsel "did nothing to effectively respond to [Juror R.R.'s] obvious misconduct." (Creque's brief, p. 56.)

73

Specifically, once trial counsel found out about Juror R.R.'s speaking to Det. Archer in a retail store during the penalty-phase weekend break, Creque contends that counsel was ineffective for failing to move for a mistrial, strike R.R., "inquire whether R.R.'s extrajudicial contact had infected other jurors," and "ask R.R. if she could follow the Court's instructions or request that the Court remind R.R. that she had violated the Court's instructions." (Creque's brief, p. 56.) This allegation is both insufficiently pleaded and without merit.

Upon seeing Det. Archer, Juror R.R. told him that "you all did a great job on that case" and "[h]aving gone through that before myself, I know how hard it is." (R. 2759.) This was brought to the parties' attention and addressed by the trial court outside the presence of the other jurors. When questioned under oath and asked what she was referring to, Juror R.R. responded that she had been on jury duty before and also that her nephew "had been in a murder case." (R. 2764.) "The trial court and Creque questioned [Det.] Archer and [Juror] R.R. under oath before the trial resumed." Creque, 272 So. 3d at 688. See also id. at 691-93. Juror R.R. emphatically testified that she had not discussed any of these things with anyone at any time. The trial court also instructed

Juror R.R. to not "discuss this with the other jurors." (R. 2768.) "[J]urors are presumed to follow the trial court's instructions." Pettibone v. State, 91 So. 3d 94, 115 (Ala. Crim. App. 2011).

First, Creque did not meet his burden of pleading his claim with specific facts that, if true, would entitle him to an evidentiary hearing on this claim, much less a new trial. Creque never alleges that Juror R.R. was biased in favor of the State and against him. Rather, he relies on the same facts already considered during the trial and on direct appeal to allege that Juror R.R. had "obvious affection" for the State. (C. 485.) Creque merely speculates that Juror R.R. was biased, that her experiences as a victim's family member, and that her contact with Det. Archer "might have impacted other jurors," and that "there was no guarantee [she] could actually follow the penalty-phase jury instructions." (Creque's brief p. 57.) (See also C. 487.) "Speculation is not sufficient to satisfy a Rule 32 petitioner's burden of pleading." Mashburn v. State, 148 So. 3d at 1125. Creque fails to allege any jurors with whom Juror R.R. might have "discussed her experience as a victim's family member or her lingering questions" or biases. (C. 487.) And, although he contends that trial counsel were ineffective for not asking Juror R.R.

if she could follow instructions and for not inquiring whether other jurors were affected, Creque never contends what the answers to those questions would have been. See, e.g., A.G. v. State, 989 So. 2d at 1173 (holding that ineffective-assistance claims were insufficiently pleaded when petitioner did not plead what questions should have been asked or what the response to those questions would have been). Creque also makes no allegation regarding how "jury dynamics would have been different" if Juror R.R. had been "properly admonished." (Creque's brief, p. 58.) In fact, the record shows that she was instructed not to discuss with the other jurors anything about her conversation with Det. Archer or her questioning by the court. (R. 2768.) Finally, Creque fails to allege any facts that show that Juror R.R. had any actual bias, as opposed to normal sympathy, for the victim's family, which is not disqualifying.

Indeed, this Court has held that there was no error in a trial court's denying a motion for a mistrial when one of the jurors, unsolicited, walked over to a witness, the capital-murder victim's granddaughter, and stated that she was "so sorry." Johnson v. State, 684 So. 2d 629, 635-37 (Ala. Crim. App. 1994). More specifically, we held that the trial court did not abuse its discretion because "[t]here [wa]s no indication that the juror

76

discussed any of the particulars of the case or that the appellant suffered any prejudice by this contact." See also Ex parte Killingsworth, 82 So. 3d 761, 764 (Ala. 2010) (Even "[t]he fact that a prospective juror knows the victim or members of the victim's family does not automatically disqualify the prospective juror for cause."). Like the juror's statement in Johnson, Juror R.R.'s statements merely "indicate sympathy for the victim rather than a belief the appellant committed the offense" or, because Juror R.R.'s statement was made after the guilt determination, a belief that Creque should receive the death penalty. 684 So. 2d at 636. In fact, Det. Archer testified: "At no time were the facts of the case or any testimony mentioned or discussed. There was no talk about anything … presented during the sentencing phase. There was no mention … of the jury deliberations" other than questions about a peripheral, irrelevant question about what happened to a Krystal employee who was never mentioned at trial but whose name was on a receipt. (R. 2761, 2765-66.)

Moreover, the underlying argument -- that Juror R.R. "was biased and initiated contact with the lead investigator, [Det.] Archer, during the trial, and that she was permitted to serve on the jury in violation of Creque's state and federal constitutional rights" -- was rejected on direct

77

appeal. Creque, 272 So. 3d at 688. Creque specifically argued on appeal "that the trial court's failure to remove [R.R.] from the jury" or "even inquire whether she could be fair and impartial" requires reversal. Id. at 690. This Court reviewed those arguments for "plain error because, although Creque made a motion for a mistrial after the matter was raised in the trial court, he raised a claim other than the one he now raises" and because "he did not request that R.R. be removed from the jury." Id.[6] In rejecting Creque's claim on direct appeal, this Court explained that:

> "the effect of the misconduct was confined to R.R., the juror who committed the misconduct. It is undisputed that R.R. told none of the other members of the jury of her conversation with [Det.] Archer. Likewise, there is no support for Creque's belated claim that R.R.'s comments to [Det.] Archer involved the substance of the penalty-phase case. There is no basis on which to find plain error in the trial court's denial of the motion for a mistrial and no basis for the trial court to have sua sponte removed R.R. from the jury."

Id. at 694-95 (emphasis added). This Court held that "[n]othing in R.R.'s testimony or in [Det.] Archer's testimony supports Creque's argument

---

[6]"Creque's only objection at trial was made after [Det.] Archer testified, and that objection was made 'on the grounds that apparently the jury felt like they didn't get all the evidence.'" Creque, 272 So. 3d at 694. "Therefore, his claim [on direct appeal] -- that R.R. was biased" and should have been removed or a mistrial granted -- was "subject to review for plain error only." Id.

that R.R. was biased in favor of the State or that her conversation with [Det.] Archer had any influence on R.R.'s verdict or the verdict of any other juror." Id. at 696. And, Creque has pleaded no additional facts to show this to be the "rare case" in which prejudice would be found under the Strickland test even though this Court already held that there was no plain error as to the underlying substantive claim. See, e.g., Ex parte Taylor, 10 So. 3d at 1078. Creque's contentions are thus meritless because "'[c]ounsel is not ineffective for failing to raise a baseless claim.'" Coan, 322 So. 3d at 560 (quoting Washington v. State, 95 So. 3d at 71).

In sum, Creque's contentions were insufficiently pleaded and without merit. Thus, the circuit court properly summarily dismissed this claim.

III. Ineffective Assistance During Penalty and Sentencing Phases

Creque argues that his trial counsel were ineffective during the penalty and sentencing phases "[b]y failing to discover or effectively marshal a wealth of mitigation evidence." (Creque's brief, p. 59.) Creque also argues that the circuit court erred by finding that the mitigation evidence he alleged should have been discovered and presented was cumulative. Creque then argues that "the record is replete with

79

additional deficiencies" during the penalty and sentencing phases. (Creque's brief, p. 74.)  Each of those claims were insufficiently pleaded, without merit, or both.

  A. <u>Counsel Failed to Present "Significant" Mitigation Evidence</u>

  In addressing Creque's multiple penalty-phase claims regarding trial counsel's alleged failure to present additional mitigation evidence, we consider the following well-settled legal principles:

> "'[C]ounsel's obligation is to conduct a "substantial investigation into each of the plausible lines of defense."' <u>Jones v. State</u>, 753 So. 2d 1174, 1191 (Ala. Crim. App. 1999) (quoting <u>Strickland</u>, 466 U.S. at 681).  '"A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made."' <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 686).  Moreover,
>
>> "'"[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."'
>
> "<u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 691)."

<u>Belcher v. State</u>, ____ So. 3d at ___.

"Likewise, a distinction must be made '"'"between counsel's complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome."'"' Marshall v. State, 182 So. 3d 573, 595 (Ala. Crim. App. 2014) (quoting McWhorter v. State, 142 So. 3d 1195, 1245 (Ala. Crim. App. 2011), quoting in turn Ray v. State, 80 So. 3d 965, 984 (Ala. Crim. App. 2011), quoting in turn Beuke v. Houk, 537 F.3d 618, 643 (6th Cir. 2008)). '"'"A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance."'"' Id. at 596 (citations omitted). And, counsel's investigation '"'"must not be evaluated with the benefit of hindsight but accorded a strong presumption of reasonableness."'"' Id. (citations omitted). We also note that '"'"[c]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively."'"' McWhorter, 142 So. 3d at 1246 (citations omitted)."

Belcher, ___ So. 3d at ___.

In addition, we have recognized that, in cases that do "'"'not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by Strickland will be hard to overcome.'"'" McWhorter, 142 So. 3d at 1245 (citations omitted; emphasis added). Moreover,

"'"[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually

81

based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."'"

Id. at 1230-31 (quoting Jones v. State, 753 So. 2d 1174, 1191 (Ala. Crim. App. 1999), quoting in turn, Strickland, 466 U.S. at 691).

"Finally,

"'"[w]hether trial counsel were ineffective for not adequately investigating and presenting mitigating evidence '"turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented."' McMillan v. State, 258 So. 3d 1154, 1168 (Ala. Crim. App. 2017) (quoting Commonwealth v. Simpson, 620 Pa. 60, 100, 66 A.3d 253, 277 (2013))."

"'Woodward v. State, 276 So. 3d 713, 773-74 (Ala. Crim. App. 2018).'

"State v. Mack, [Ms. CR-2023-0284, Dec. 20, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024). Thus, 'when evaluating any case of ineffective assistance of counsel related to the penalty phase of a capital-murder trial, we must consider what counsel did, in fact, present in the way of mitigation.' Mack, ___ So. 3d at ___. '"'Although petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.'"' Id. at ___ (quoting Ray [v. State], 80 So. 3d [965,] 979 [(Ala. Crim. App. 2011)], quoting

82

in turn <u>Chandler v. United States</u>, 218 F.3d 1305, 1320 (11th Cir. 2000))."

<u>Belcher</u>, ___ So. 3d at ___.

On appeal, as in his petition, Creque alleges that "counsel failed to effectively develop [mitigating] evidence." (Creque's brief, p. 60.) Creque then proceeds to list the following evidence that he believes should have been presented during the penalty phase: (1) Creque's mother's "physical, verbal, and psychological abuse of her children," particularly "graphic stories" that she beat her children with a bat and withheld food (Creque's brief p. 61); (2) Creque's mother's "cocaine addiction," as well as her spending money the family needed for necessities on drugs, her pulling Creque out of elementary school, her witnessing the drowning death of her sister, and her "family's history of mental illness" (Creque's brief, p. 62); (3) Creque's "deep depression" following his father's death (Creque's brief, p. 63); (4) the family's loss of "income and stability" after Creque's father died (Creque's brief, p. 63); (5) "unbearable" financial pressures leading up to the crimes because Creque had a "young family" to support and Brittany Orr's "postpartum depression … prevented her from working" (Creque's brief, pp. 64-65); (6) "Creque <u>may</u> have been sexually abused" (Creque's brief p. 65 (emphasis added)); and (7) "[t]here were

83

many family members willing and able to testify who could have provided specific, anecdotal stories about Creque's sweet and hardworking nature as a child" but "[n]one were called." (Creque's brief, pp. 65-66.)

In summarily dismissing Creque's petition, the circuit court found these claims to be insufficiently pleaded, particularly considering that the additional facts pleaded were "cumulative" to the evidence that was presented at trial. (C. 781-83.) The circuit court also explained that the facts pleaded did "not show that trial counsel fell below an objective standard of reasonableness or that [he] was prejudiced," that "the outcome of his case would have been different had trial counsel offered this evidence/witnesses," or even "that the witnesses would have been present and available during the trial." (R. 781-83.) On appeal, "[Creque] does not address the circuit court's finding that his claim of ineffective assistance of counsel in relation to [mitigating evidence] was insufficiently pleaded." Wilson v. State, [Ms. CR-21-0109, Aug. 22, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025). Creque's only contention is the bare allegation that "the court misapplied the prejudice standard by failing to appreciate how the omitted mitigation evidence could have rebutted the State's theory of the case and by declining to consider the

84

evidence cumulatively." (Creque's brief, p. 59.) In addition, Creque cites only two legal authorities in this section of his brief for general propositions of law.[7]

Regardless of Creque's failure to address certain aspects of the trial court's order in its brief to this Court, the record supports the circuit court's finding that Creque failed to sufficiently plead facts that, if true, suggest that counsel's performance was deficient, much less that he was

---

[7]Creque cites Wiggins v. Smith, 539 U.S. 510, 535 (2003), solely for the proposition that "defendants who commit criminal acts that are attributable to a disadvantaged background … may be less culpable than defendants who have no such excuse." However, trial counsel did present evidence of Creque's disadvantaged background, just not as much evidence as postconviction counsel, using hindsight, would have liked to have presented. Creque also cites Collier v. Turpin, 177 F. 3d 1184, 1202 (11th Cir. 1999), for the proposition that counsel is constitutionally ineffective for giving "the impression that the witnesses knew little or nothing about [the defendant]." Again, Creque does not explain how what occurred at his trial was similar to what occurred in Collier, particularly when 10 witnesses testified in that case with "minimal" testimony and a "number of witnesses" testified only as to "Collier's reputation for truth and veracity -- a matter wholly irrelevant." Id. at 1201. Creque's trial counsel, however, presented the testimony of two corrections officers, a former coworker, a former boss, a mitigation expert (who had conducted extensive investigation of his history through family and friends and had obtained various school and medical records), a ministry coordinator and instructor, and Creque's stepfather, as well as the testimony of Creque himself. (R. 2661-2739, 27773-2839, 2847-2859.) And, the testimony provided multiple, significant mitigating circumstances.

prejudiced by his counsel's performance, particularly in light of the record and the mitigating evidence that counsel presented during the penalty and sentencing phases of Creque's trial. In short, as we noted on direct appeal:

> "Creque presented a variety of evidence offered as support for the imposition of a sentence of life imprisonment without the possibility of parole, including: testimony about his <u>chaotic upbringing</u> that included <u>physical and emotional abuse</u>; evidence about his <u>learning disabilities</u>, <u>educational deficiencies</u>, and the <u>lack of appropriate parental role models</u>; evidence of his <u>chronic abuse of drugs and alcohol</u>; and evidence that he had sustained <u>numerous concussions</u> and <u>other physical injuries during</u> his <u>childhood</u>."

<u>Creque</u>, 272 So. 3d at 674 (emphasis added).

First, Creque contends that trial counsel "failed to present any evidence about [his mother's] physical, verbal, and psychological abuse of her children," specifically about her withholding food and beating them with a bat. (Creque's brief, pp. 61-62.) However, the record reveals that evidence of Creque's mother's "physical, verbal, and psychological abuse" was presented to the jury. Specifically, Cheri Hodson, an experienced mitigation expert, was hired by trial counsel to investigate, collect records, and interview Creque and family members and friends in order to compile a "life history" of Creque. (TR. 2679-84.) Hodson was receiving

86

records that she had requested at least as early as June 4, 2013, (STR. 1810), well before the penalty phase began on October 11, 2013. Indeed, Hodson mentioned her multiple attempts "over two years" to interview Creque's mother. (TR. 2795.) Although Hodson attempted to contact Creque's mother "on multiple occasions," she was successful in meeting with her only once for "any length of time," and that was for only "30 minutes." (TR. 2687.) Hodson testified that Creque's mother repeatedly avoided her and even "left the state and changed her phone number." (TR. 2687, 2701-02, 2792.) Hodson also testified that she attempted to contact Creque's sister and "was told she was unavailable" and in South Carolina, but "she was actually in an apartment in Augusta, Georgia with her mother." (TR. 2687.) And, once, when Hodson called Creque's sister's phone, his mother answered. Hodson also testified that Creque's mother was not even in the courtroom for her son's penalty phase. Hodson was able to meet with a dozen other family members and friends, including Creque's grandmother and cousins and his stepfather, Dewayne Carrion. (TR. 2687-88, 2793.) Hodson testified that she learned that Creque's mother constantly "belittled" Creque, calling him "stupid, retarded" and saying that he "couldn't do anything right" in his

mother's eyes and "no matter what he did it was not enough for her." (TR. 2689, 2698, 2728.) She "was not supportive of [Creque's] grief after the death of his father." (TR. 2698.) Creque's mother "never stayed in one place very long" and was always leaving him, sometimes for "months," with other people, including people not related to Creque. (TR. 2689-90, 2693-94, 2788.) Creque's father was in such bad health that Creque "became his primary caretaker at the age of eight, and [he] and his father shared a bedroom" because Creque's mother "needed her space." (TR. 2692, 2706.) Testimony at trial revealed that Creque's mother smoked marijuana while pregnant with Creque and that she began smoking it with him when he was a young teenager and even "sent him out to procure marijuana for her" when he was only 14 or 15 years old. (TR. 2695-96, 2698, 2714.) She removed Creque from school in the fifth grade. Creque visited doctors approximately 90 times between 1995 and 2007, including 17 visits in 1995 and 17 visits in 1999, according to medical records. (TR. 2703-05.) Creque's mother even kept the family refrigerator "locked." (TR. 2706.) As a child, Creque was physically punished "with a coat hanger, extension cord, whatever." (TR. 2787.) Creque's parents also had "violent arguments." (TR. 2692.)

Leading up to the crimes, Creque's mother was critical of his parenting. On August 23, 2011, his mother asked him to buy her bubble gum, but he bought the "wrong" kind, and she berated and belittled him for it. (TR. 2724, 2730-31.) Creque's stepfather testified that she was "very angry" and called Creque "stupid," "incompetent," and "retarded." (TR. 2829-30.) Creque testified that his mother berating him the day before the crimes "caused [him] to not be rationally thinking." (TR. 2858.) In addition, multiple witnesses, including Creque, testified that his mother did not even visit him in jail the first year. Creque also testified that there were times that he would call his mother, and she would not answer. (TR. 2837, 2851-52, 2874.)

The jury heard ample evidence regarding Creque's mother and her abuse of Creque, both as a child and the day before the crimes. The circuit court did not err in finding <u>additional</u> evidence that she had allegedly beaten her children with a bat, in addition to the other inappropriate and cruel objects that were testified to at trial, would have been anything but cumulative. <u>See, e.g.</u>, <u>Peraita v. State</u>, 386 So. 3d 799, 835 (Ala. Crim. App. 2021) (noting that "counsel is not ineffective for failing to present cumulative evidence").

89

Second, the additional evidence indicating that Creque's mother used cocaine in addition to marijuana would have merely been cumulative of the evidence of her drug abuse. Testimony was presented about Creque's family history of criminal behavior and substance abuse. (TR. 2691, 2785.) In addition, Creque pleaded no facts that would indicate that counsel's failure to offer evidence of his mother's use of <u>cocaine</u> in addition to marijuana would have, to a reasonable probability, resulted in a different outcome, particularly considering the evidence that she smoked marijuana while pregnant with Creque and with him when he was a young teenager, as well as "sent him out to procure marijuana for her" when he was only 14 or 15 years old. (TR. 2695-96, 2698, 2714.) And, Creque's contentions that counsel should have presented evidence regarding his mother "and <u>her</u> family's history of mental illness" and the "drowning death of <u>her</u> sister" are insufficiently pleaded because he has never explained how that information about <u>his</u> <u>mother</u> would mitigate his behavior. (Creque's brief, p. 62.) Certainly, the ways Creque's mother failed him are mitigating (and were, in fact, presented to the jury during the penalty phase of Creque's capital-

murder trial), but facts that might explain <u>her</u> failings are not relevant to <u>Creque's</u> behavior and sentencing.

Third, that Creque was in "the depths of … grief" over his father's death is cumulative to the testimony that Creque was "most affected by [his father's] death" and that Creque's mother "was not supportive of [Creque's] grief after the death of his father." (TR. 2697-98.)  In addition, there was testimony that Creque's father died when he was 17 years old (about 4 years before the crimes) and that Creque moved out and was "on his own" after that.  (TR. 2693, 2788.)  Additional details regarding Creque's grief or his financial condition after his father's death were, as the circuit court found, cumulative.  Again, "counsel is not ineffective for failing to present cumulative evidence."  <u>Peraita</u>, 386 So. 3d at 835.

Fourth, Creque's contentions regarding trial counsel's alleged failure to present evidence that his family had no financial support after his father died and that he was financially responsible for his mother are insufficiently pleaded and refuted by the record.  There was ample testimony that Creque was "on his own" at 17 years of age after his father died, as well as that Creque was working 2 jobs and was not sleeping while taking care of his girlfriend and child around the time of the crimes.

(TR. 2712, 2721, 2727, 2788, 2797.) Moreover, Creque's stepfather testified during the penalty phase that Creque was the "sole provider" of his <u>own</u> family but that he did <u>not</u> help support his mother, refuting Creque's allegation in his petition that the burden of supporting his <u>entire</u> family fell on Creque. (TR. 2825-26.)

Fifth, that Creque's financial pressures leading up to the offenses were "unbearable" was also cumulative to the evidence that was presented. There was ample evidence presented indicating that Creque, who did not even attend school past the fifth grade (and was purportedly homeschooled by his mother after that), was "on his own" to support himself when he was 17 years old and worked 2 jobs, as well as taking care of both his girlfriend and his child. (TR. 2712, 2721, 2727, 2788, 2797.) Testimony during the penalty phase was that, in addition to working two jobs, Creque got up with his baby, made Brittany Orr breakfast, and took care of Brittany Orr and their baby. (TR. 2721.) In addition, Brittany often asked Creque's family to care for Creque's child, and Creque's mother believed Brittany was a "bad mother." (TR. 2712.) Considering what was presented, the specific allegations that Brittany could not work because of "postpartum depression" or that the family had

"car trouble" around the time of the crimes, even if true, do not suggest deficient performance, much less prejudice. There is simply no suggestion that presenting additional details would have, to a reasonable probability, resulted in a different outcome.

Sixth, Creque contends that counsel was constitutionally ineffective because "[t]he jury never heard that [he] may have been sexually abused." (Creque's brief, p. 65 (emphasis added).) In his petition, Creque pleaded, as Dr. Carol Walker testified during the sentencing phase, that his bed-wetting and encopresis as a child and into his adolescence "could be a red flag for sexual abuse." (C. 494 (emphasis added).) Likewise, Creque pleaded that "Hodson could have informed the jury that these factors may be indicators of abuse." (C. 502 (emphasis added).) Clearly, Creque's contention on appeal, as in his petition, is based on nothing more than speculation. Creque has never alleged that he was, in fact, sexually abused by his father or anyone else for that matter. In short, "'[s]peculation is not sufficient to satisfy a Rule 32 petitioner's burden of pleading.'" Brooks v. State, 340 So. 3d 410, 474 (Ala. Crim. App. 2020) (quoting Mashburn, 148 So. 3d at 1125).

Accordingly, the circuit court did not err when it summarily dismissed this speculative claim.

Moreover, such information was and is within Creque's own knowledge and could have been told any of the numerous times that Creque met with counsel, the mitigation expert Hodson, or the neuropsychologist Dr. Walker. See, e.g., Washington v. State, 95 So. 3d 26, 52 (Ala. Crim. App. 2012) (recognizing that "'[c]ounsel's actions are usually based, quite properly, on … information supplied by the defendant'" (quoting Strickland, 466 U.S. at 691)). Accordingly, Creque did not sufficiently plead this contention that counsel was ineffective for not presenting the "possibility" that he was sexually abused as a child.

Seventh, Creque contends that counsel should have called multiple witnesses to testify about "specific anecdotal stories about Creque's sweet and hardworking nature as a child." (Creque's brief, p. 66.) However, not only did Creque not explain how those stories should have been discovered or that they were known and simply not presented to the jury, but they were, like the other mitigating evidence, cumulative to the testimony that was presented during the penalty phase. According to Creque's family and friends, as a child Creque was "very helpful,"

"mannerly," a "very kind, "soft-spoken child," "loving, "sensitive," "most affected by [his father's] death," (TR. 2690, 2697.)   In addition, counsel called a former coworker, a former employer, and two corrections officers to testify on Creque's behalf during the penalty phase, and they all testified that Creque was very polite, punctual, hard-working, respectful, cooperative, and even "a man of character."  (TR. 2663, 2665, 2670-71, 2673, 2676.)   His coworker and former employer were shocked when Creque was charged with the crimes.  (TR. 2673, 2676.)  In addition, a minister who taught faith-based classes at the jail testified that Creque had taken multiple classes and was "very respectful" and did a "very good job."  (R. 2814-2815.)  Counsel used this information in closing to argue that the crimes were an "aberration" and that Creque was a good person both before and after the crimes and, thus, "redeemable" and not deserving of the death penalty.

In sum, counsel is not tasked with locating every witness who could provide an "anecdote" about a defendant's life.   Counsel is constitutionally required to conduct a <u>reasonable</u> investigation and present that which is <u>reasonably</u> discovered through witnesses who are <u>available</u> and <u>willing to testify</u>.  Considering the extensive mitigation

95

investigation conducted by Hodson and the extensive evidence presented at trial, we agree with the circuit court that Creque did not sufficiently plead this claim that counsel was ineffective for not presenting more (or more persuasive) mitigation evidence. There is nothing in Creque's petition, particularly considering the record, to suggest that, if this additional information had been presented, Creque would not have been sentenced to death. The omission of the mitigation evidence that Creque contends should have been presented does not indicate constitutionally ineffective assistance. Thus, "there is no individual or cumulative effect" of the pleaded mitigating facts and circumstances. (C. 836 (citing Taylor v. State, 157 So. 3d 131, 140 (Ala. Crim. App. 2010) (recognizing that no appellate court in Alabama had applied a cumulative-effect analysis to an ineffective-assistance-of-counsel claim but that, "even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor's obligation to plead each claim of ineffective assistance of counsel")).)

Furthermore, "'"'[w]hen a defendant challenges a death sentence …, the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it

independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"'" Stanley v. State, 335 So. 3d 1, 55 (Ala. Crim. App. 2020) (citations omitted). "'"'To assess that probability, we consider the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- and reweigh it against the evidence in aggravation.'"'" Id. at 55-56 (citations omitted). We also "'"'consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied.'"'" Id. at 56 (citations omitted). Considering the evidence Creque contends counsel should have presented in mitigation, what trial counsel, in fact, presented at his trial, the overwhelming strength of the evidence (which included Creque's own statements before trial that he shot and killed both Graff and Aguilar, and his testimony at trial that he shot and killed Graff), and the corroborating evidence, and reweighing the evidence in mitigation against the evidence in aggravation, we hold that the circuit court properly dismissed this claim because it was both insufficiently pleaded and without merit. There is no reasonable probability that the additional mitigation evidence proffered by Creque in his petition would

have resulted in his receiving a different sentence. Although Creque testified that he was remorseful and apologized to the victims' families and the jury for his actions (TR. 2853), the mitigation evidence he now faults counsel for not discovering and presenting could not overcome the ample evidence against him and the callous nature in which he robbed and killed his coworkers, whom he knew and worked with, for a "relatively insignificant amount of money." (Creque's brief, p. 85.)

We further note that the record shows that, to the extent that additional mitigating evidence was not presented, the record indicates that counsel was prevented from presenting it by Creque himself. Counsel cannot be faulted that Creque clearly was protecting his mother and sister and did not want them to testify at trial. Trial counsel, in fact, put on the record that they were not calling Creque's mother or sister to testify on his behalf during the penalty phase because, as Creque himself told the court, he had "specifically instructed [counsel] not to call [either one] as a witness." (R. 2840, 2845.) Creque also appeared not to want to testify about his childhood himself, testifying, when asked, that Hodson's testimony was true "as far as I can remember." (R. 2848.) "'What investigation decisions are reasonable depends critically on'" the

"'defendant's own statements or actions.'" Broadnax v. State, 130 So. 3d 1232, 1248 (Ala. Crim. App. 2013) (quoting Strickland, 466 U.S. at 691). Creque has "pleaded no facts to explain how, if the jury had known this additional information [pleaded in his petition], there is a reasonable probability that [he] would not have been ... sentenced to death." Belcher, ___ So. 3d at ___. Indeed, the facts pleaded do not indicate that no reasonable lawyer or mitigation expert would have failed to discover them or procure additional testimony, particularly when Creque himself did not want his mother or sister to testify. Moreover, considering the testimony that was presented, "[w]e are confident that [the additional mitigating evidence] would have had no impact on the penalty phase proceedings." Lee v. State, 44 So. 3d 1145, 1161 (Ala. Crim. App. 2009) (affirming the summary dismissal of Lee's postconviction petition (citing Wiggins v. Smith, 539 U.S. 510 (2003))).

B. The Circuit Court Erroneously Found the Evidence Cumulative

Creque next contends that the circuit court rejected his ineffective-assistance of counsel claims regarding the penalty and sentencing phases of his capital-murder trial by erroneously finding the mitigation evidence pleaded in his petition was cumulative to the mitigation evidence that

was presented. However, as explained above, the record amply supports the circuit court's finding that the additional mitigation evidence Creque pleaded in his petition is, in fact, cumulative.

### C.    Additional Penalty-Phase Deficiencies

Creque also alleges a list of "errors" that he says rendered trial counsel constitutionally ineffective during the penalty and sentencing phases of his capital-murder trial, including counsel's failing to object to errors he alleged the trial court committed. Specifically, Creque contends that (1) counsel "did not perform an adequate investigation" and "did not visit [him] between the guilt and penalty phases" (Creque's brief, p. 74); counsel hired the mitigation expert, Hodson, "only six months before trial" and hired Dr. Walker after the penalty phase (Creque's brief, p. 76); and counsel failed to hire Dr. Lopez (instead of Dr. Kalin) who he says "would have illuminated Creque's" ability to appreciate his conduct and conform to the law (Creque's brief, p. 77). Creque also contends that (2) counsel failed to introduce "some" mitigation evidence that "was known to counsel" and failed to "adequately prepare any defense witnesses for their testimony" (Creque's brief p. 78); counsel was "unprepared to get Hodson's exhibits into evidence" (Creque's brief, p. 79-

81); "counsel's opening statement was less than four pages" and "had no story, theory, or theme" (Creque's brief, p. 81); and counsel's closing argument "listed facts but rarely explained why they supported a life sentence and advanced no clear mitigation theory." (Creque's brief, p. 82.) Creque then contends that (3) counsel "failed to present any evidence explaining why mitigation was warranted based on [his] relatively young age and reduced mental capacity" (Creque's brief, p. 83). Creque last contends that (4) counsel failed to object to the trial court's asking Dr. Walker whether her testing showed that Creque could not understand right from wrong and that counsel was constitutionally ineffective for not making another closing argument at the sentencing hearing before the trial court. (Creque's brief, p. 87.)

Creque ends his summation of those myriad errors with the one-sentence allegation that "[e]ach of these errors also supports [his] claims for Rule 32 relief, and the Circuit Court erred in dismissing them." (Creque's brief, p. 91.) However, Creque does not explain why the circuit court's summary dismissal of this claim as insufficiently pleaded was erroneous. Perhaps, this is because the circuit court did not err in summarily dismissing Creque's contentions as insufficiently pleaded. As

the circuit court found, Creque pleaded no facts to indicate that trial counsel's performance was deficient or that he was prejudiced by that performance.

The insufficiency of Creque's pleadings regarding his contentions are even more clear when considered with the record. For example, Creque alleges on appeal, as in his petition, that "trial counsel only met with him six times … before trial, with none of the meetings lasting more than 90 minutes."[8] (Creque's brief, p. 12 (citing C. 416).) The inmate logs, however, show seven, not six "ATTY" events from April 9, 2013, to October 6, 2013. (STR. 1869.) In addition, the log notes show Creque's location as being in the "Attorney's Room" numerous times between November 1, 2012, and October 7, 2013. (STR. 1879-87.) Several of these visits were approximately two hours long. (See, e.g., STR. 1885 (on September 24 and 25, 2013, respectively, Creque was in the "attorney's room" from 15:19 to 17:42 and from 16:29 to 18:22 before returning to his cell), STR. 1886 (on September 29, 2013, Creque was in the "attorney's

---

[8]Notably, in his original petition (filed June 9, 2021), Creque alleged that trial counsel met with him six times and that "[e]ach visit lasted no more than 1.5 hours." (C. 237.)

room" from 17:07 to 19:04 before returning to his cell), STR. 1886 (on October 6, 2013, Creque was in the "attorney's room" from 15:51-17:52 before returning to his cell), STR. 1887 (on October 7, 2013, Creque was in the "attorney's room" from 17:25 to 18:39.) In addition, the mitigation expert, Hodson, had been working on Creque's mitigation evidence in preparation for his penalty phase at least as early as June 4, 2013 (STR. 1810), well before the penalty phase began on October 11, 2013. And, Hodson spent "a good couple of hours" with Creque the first time they met and "an hour or so" the second time she met with Creque, in addition to talking with family and friends and gathering records. (TR. 2713.) Hodson also mentioned her multiple attempts "over two years" to interview Creque's mother. (TR. 2795.) Considering the record, Creque's contention that counsel did not visit him between the guilt and penalty phases does not suggest that counsel's penalty-phase performance was deficient, much less that it prejudiced him.

Creque also alleges on appeal and in his petition that trial counsel should have prepared to get Hodson's various exhibits into evidence, but he mentions only the "social history report" in his petition and baldly contends that counsel should have gotten it admitted without explaining

103

how counsel should have done so and that he would not have been sentenced to death if it had been admitted without explaining why. (C. 500, 503.) Moreover, this Court reviewed Creque's arguments on direct appeal that this report, and other exhibits prepared by Hodson, should have been admitted during the penalty phase and held that this report (and others) was neither relevant nor probative and that there was no error in the trial court's exclusion of it. Creque, 272 So. 3d at 718. Thus, "'[b]ecause the substantive claim underling the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.'" McMillan v. State, 258 So. 3d 1154, 1191 (Ala. Crim. App. 2017) (quoting Lee v. State, 44 So. 3d 1145, 1173 (Ala. Crim. App. 2009)).

Counsel's closing argument provides another example. Contrary to Creque's postconviction contentions, trial counsel's penalty-phase closing argument was extensive and listed the following mitigating circumstances for which counsel had presented evidence during the penalty phase: Creque was a "mannerly young man," a "hard worker," a "model prisoner," and a "good student" in jail; Creque "had a pretty crappy childhood," which included receiving a "poor education" and

lacking "parental involvement," living a "vagabond lifestyle," and using drugs with his mother and procuring drugs for her; Creque's mother was verbally, emotionally, and physically abusive, specifically beating him with a "coat hanger" and an "extension cord" and calling him "stupid" and "retarded," which resulted in "disastrous long-term effects"; Creque suffered from "health problems" and his mother had "health problems"; Creque had a significant substance-abuse problem that began when he was a child; Creque had been "on his own from 17 years old and had a baby at 21 and a girlfriend"; Creque suffered from lack of sleep and used a substantial amount of drugs leading up to the crimes; Creque "had just turned 21" at the time of the crimes; this was Creque's first criminal offense; Creque was remorseful; and Creque was deserving of the jury's "mercy." (R. 2903-12.) Particularly considering the argument that was given, Creque pleaded no facts to show that counsel's performance was deficient, much less that he was prejudiced by counsel's actions.

Similarly, Creque pleaded and argues on appeal that trial counsel should have better explained why his "young age of 21" was a mitigating circumstance, but Creque has presented no case that supports a finding of ineffective assistance of counsel by failing to present scientific evidence

regarding a 21-year-old defendant's brain development. And, this Court reviewed the trial court's findings regarding aggravating and mitigating circumstances on direct appeal and held that its findings "are supported by the evidence." Creque, 272 So. 3d at 731.

In sum, Creque's claims were either insufficiently pleaded in his petition, without merit, or both. Moreover, "the evidence presented against [Creque] in the guilt phase was overwhelming." Lee, 44 So. 3d at 1159. Creque confessed to shooting both victims before trial and to shooting one of the victims at trial. In addition, there was substantial other evidence corroborating Creque's confessions: a few hours before committing the crimes, he bought the only gun used in the crimes and even loaded it; he also confessed to getting rid of his clothes and shoes, which were found where he said he disposed of them, as was the money that he hid in the apartment in which he lived at the time. Considering Creque's pleadings and the testimony that was, in fact, presented during his guilt, penalty, and sentencing phases, "[w]e are confident that [the additional mitigating evidence and objections] would have had no impact on the penalty phase proceedings." Lee, 44 So. 3d at 1161 (affirming the summary dismissal of Lee's postconviction petition (citing Wiggins v.

106

Smith, 539 U.S. 510 (2003))). We also note that "'"[a]n accused is entitled '"not [to] errorless counsel, and not [to] counsel judged ineffective by hindsight, but [to] counsel reasonably likely to render and rendering reasonably effective assistance."'"'" Hunt v. State, 940 So. 2d 1041, 1059 (Ala. Crim. App. 2005) (citations omitted).

IV.   Ineffective Assistance in "Myriad Other Ways"

Creque also argues that trial counsel rendered constitutionally ineffective assistance in "myriad other ways," specifically that trial counsel was ineffective by not "adequately" moving for a change of venue, not "adequately" advising and preparing Creque to testify, not "adequately" investigating Creque's codefendants and "present[ing] an alternative theory that Gholston was the real shooter of both victims," not "adequately" utilizing forensic experts "to support the defense theory of 'accidental shooting,'" not "adequately challeng[ing] the state's forensic evidence … fingerprint and ballistics analysis," not "effectively cross-examin[ing] Creque's then-girlfriend, [Brittany] Orr," and "fail[ing] to engage a psychologist before trial in order to determine whether to raise an Atkins[ v. Virginia, 536 U.S. 304 (2002),] challenge or some other related defense." (Creque's brief, pp. 88-90.)

Creque's claims were either insufficiently pleaded, without merit, or both. In his petition, Creque alleged that trial counsel should have "presented testimony from the market researcher that encompassed more than just statistics and publicity and ... provided evidence sufficient to satisfy a finding of presumptive prejudice." (R. 442.) However, Creque made the same argument on direct appeal that he made in his petition, that there was "presumptive prejudice because the pretrial publicity saturated the community with prejudicial and inflammatory reports." Creque, 272 So. 3d at 723. At best, there was only one additional allegation in his petition -- that his "family also received numerous death threats" (C. 443), although he never gave a time for when those were received or explained how those would have shown "presumed prejudice" that warranted a change of venue. Indeed, threats have nothing to do with a change-of-venue claim. This Court explained on direct appeal: "'""To justify a presumption of prejudice ... the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.'"'" 272 So. 3d at 721 (citations omitted). "'Only when "the pretrial publicity has so 'pervasively saturated' the

community as to make the 'court proceedings nothing more than a "hollow formality"'" will presumed prejudice be found to exist.'" Id. (citations omitted). This Court further explained:

> "'In determining whether presumed prejudice exists, we look at the totality of the circumstances, including the size and characteristics of the community where the offense occurred; the content of the media coverage; the timing of the media coverage in relation to the trial; the extent of the media coverage; and the media interference with the trial or its influence on the verdict. See, e.g., Skilling v. United States, 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), and Luong v. State, 199 So. 3d 139, 146 (Ala. 2014). "[T]he 'presumptive prejudice' standard is '"rarely" applicable, and is reserved for only 'extreme situations."'" Whitehead v. State, 777 So. 2d 781, 801 (Ala. Crim. App. 1999), aff'd, 777 So. 2d 854 (Ala. 2000) (quoting Hunt [v. State], 642 So. 2d [999,] 1043 [(Ala. Crim. App. 1993)], quoting in turn, Coleman [v. Kemp], 778 F.2d [1487,] 1537 [(11th Cir. 1985)].'"

Id. (quoting Floyd v. State, 289 So.3d 337, 374 (Ala. Crim. App. 2017)) (emphasis added). On direct appeal, this Court rejected Creque's preserved claim that his change-of-venue motion should have been granted based on actual prejudice, and we also rejected Creque's claim based on presumed prejudice, albeit using a plain-error standard of review. After a thorough analysis, we held that "Creque did not make a showing that his case is in that rare category, and he is not entitled to relief" based on presumed prejudice. Id. at 724. Creque has pleaded no

additional facts in his petition that, if true, would show presumed prejudice, much less that would result in the rare finding of prejudice under Strickland would be met after rejection under the plain-error standard of review. See, e.g., Ex parte Taylor, 10 So. 3d at 1078 and White, 343 So. 3d at 1183.

The circuit court properly found that Creque is not entitled to relief on the claim in his petition that "counsel failed to adequately advise [Creque] about testifying and failed to prepare him for his testimony" because the petition did not say "what specific advice" should have been offered. (C. 777.). Moreover, even in his brief on appeal, Creque merely speculates that, "with better advice preparation, Creque may have chosen not to testify at all or would have been better able to handle his lapses in memory and the discrepancies between his trial testimony and his so-called 'confession.'" (Creque's brief, p. 89.) Again, "[s]peculation is not sufficient to satisfy a Rule 32 petitioner's burden of pleading." Mashburn, 148 So. 3d at 1125.

The circuit court also properly dismissed the claim that counsel failed to "adequately investigate … Creque's co-defendants … or present an alternative theory that Gholston was the real shooter of both victims"

as insufficiently pleaded. In his petition, Creque alleged that Creque's brother and "multiple witnesses" he never named could have testified that Gholston had attempted to get Creque "to rob someone on numerous prior occasions and that … Creque refused." (C. 426.) Even if true, Creque pleaded no facts that have any relevance to Creque's decision to participate in the Krystal robbery, which he admitted to both at trial and in his pretrial statements. (C. 427.) He also never stated what he would have discovered about Eldred (other than that she "also worked at Krystal" and also "would have been privy to any security weaknesses") or who would have testified to that. Regardless, none of these allegations, even if true, would absolve or even mitigate Creque's admitted culpability in participating in the robbery and shooting and killing Graff (which he admitted at trial), much less his shooting and killing both Graff and Aguilar (which he admitted in his pretrial confession). Moreover, Creque's additional allegation that counsel should have advanced a theory that "Gholston had far more of a motive" and that "Gholston intentionally murdered the victims" would have contradicted Creque's pretrial statements and his trial testimony. (C. 454.) Thus, this claim was both insufficiently pleaded and, in light of the record, meritless.

The circuit court also properly summarily dismissed, as insufficiently pleaded, the claim that "counsel failed to adequately utilize forensic experts ... to support the defense theory of 'accidental shooting'" and to "adequately challenge the State's forensic evidence." (Creque's brief, pp. 89-90.) "'It is well settled that, to properly plead a claim that counsel were ineffective for failing to hire an expert witness, the petitioner must, among other things, identify by name the expert witness his counsel should have hired, set out the testimony that the named expert would have given, and plead that the named expert was both willing and available to testify at trial.'" Burgess v. State, 413 So. 3d 30, 49 (Ala. Crim. App. 2023) (quoting Brooks v. State, 340 So. 3d 410, 437 (Ala. Crim. App. 2020)). Creque did not name an expert that could have contradicted the State's evidence at trial; nor did he outline the proposed testimony of any such expert. Likewise, Creque pleaded that counsel should have cross-examined the State's experts to cast doubt on Creque's fingerprints being found on the money bag, on the gunshot wound being a contact wound, and on whether Creque's HiPoint .9 mm gun was used to shoot both victims. (C. 463-71.) However, Creque never acknowledged how casting doubt on that evidence would have contradicted Creque's

112

own statements, both before trial and during his trial testimony, that he participated in the robbery, that he accidentally shot Graff during a struggle over the cooler door, or that he and Gholston used the HiPoint .9 mm gun Creque purchased a few hours before the robbery. Moreover, before trial Creque's counsel did hire and present "the testimony of Janice Johnson, a … crime-scene analyst who had experience in crime-scene reconstruction," and she "examined the physical evidence as well as photographs taken at the scene and reports generated by the State's experts." Creque, 272 So. 3d at 698. This Court summarized Johnson's testimony:

> "Johnson testified about numerous actions of law-enforcement officials and crime-scene analysts in Creque's case that, she said, had not been performed properly, and she said other actions to preserve evidence properly should have been taken, but were not. For example, Johnson identified photographs of boxes inside and outside the cooler that had what appeared to be blood on them, and she said that the stains had not been photographed with a scale to show the size of each stain. She said, furthermore, that the stains had not been swabbed and analyzed, so there was no way to determine whether they were bloodstains and, if so, whether the blood was from Aguilar or Graff. Throughout her testimony, Johnson noted repeatedly that bloodstains and blood spatter were photographed without a scale, making it difficult to determine what had happened at the scene."

<u>Id.</u> Johnson also testified, contrary to the State's crime-scene technician, that the evidence indicated that Graff was "above the floor" when he was shot and that the evidence did not contradict Creque's testimony that Graff was shot when his gun fired "accidentally." <u>Id.</u> at 698-99. This trial testimony was favorable to Creque, and his postconviction petition does not proffer expert testimony that would have been more favorable to him.

The circuit court also properly dismissed the claim that counsel "failed to effectively cross-examine" Brittany Orr as insufficiently pleaded. (Creque's brief, p. 90.) Creque pleaded in his petition that Brittany was never asked how many officers interviewed her and whether she had been yelled at or threatened to offered a plea deal. However, Creque never pleaded how Brittany would have responded to such questions. Thus, this contention is entirely speculative.

Creque's last contention in his laundry list of claims is that "counsel failed to engage a psychologist <u>before</u> trial in order to determine <u>whether</u> to raise an <u>Atkins[ v. Virginia</u>, 536 U.S. 304 (2002),] challenge or some other related defense." (Creque's brief, p. 90 (emphasis added).) Likewise, Creque asserts on appeal that "[a]n <u>Atkins</u> or related defense was <u>potentially</u> available." (Creque's brief, p. 91 (emphasis added).) This

114

contention is insufficiently pleaded and speculative. See Mashburn, 148 So. 3d at 1125. In his petition, Creque contended that counsel was ineffective for failing to engage either a psychologist or psychologist to evaluate him before trial, particularly because Creque was evaluated after trial and determined to have "low" intelligence. However, Creque never pleaded who should have been hired and that they would have been available. To the extent that Creque believes that Dr. Walker should have evaluated him and presented his findings at the penalty phase instead of to the trial court alone at sentencing, Creque still pleaded no facts that his IQ was low enough to warrant an Atkins challenge. Likewise, Creque pleaded no facts that a different expert was available to testify who, contrary to Hodson and Dr. Walker, would have found Creque mentally unfit for the death penalty under Atkins and been available to testify at Creque's trial. (C. 416, 441.) "'It is well settled that, to properly plead a claim that counsel were ineffective for failing to hire an expert witness, the petitioner must, among other things, identify by name the expert witness his counsel should have hired, set out the testimony that the named expert would have given, and plead that the named expert was both willing and available to testify at trial.'" Burgess

115

v. State, 413 So. 3d 30, 49 (Ala. Crim. App. 2023) (quoting Brooks v. State, 340 So. 3d 410, 437 (Ala. Crim. App. 2020)).

Considering the record, Creque pleaded no facts to show that counsel was ineffective for not hiring an expert to pursue an Atkins or similar challenge. Although Hodson discovered and testified that Creque had difficulties in school and "low test scores," Hodson's opinion was that Creque was "reasonably intelligent," and had "undiagnosed learning disabilities." (TR. 2703, 2707, 2801.) Thus, trial counsel's initial investigation did not make further consideration of Atkins claims necessary. Moreover, that any such challenge would have been successful, and, thus, that counsel was ineffective for not raising it or not raising it sooner, is refuted by the record and is meritless. Dr. Walker, the neuropsychologist who testified at Creque's sentencing hearing, testified that she administered "a battery of tests" and determined that Creque "does not fall within the range of being mentally retarded." (TR. 2974-76, 2995.) Moreover, Dr. Walker testified that Creque's "scores ranged from low average to superior on one task." (TR. 2936.) On "visual spatial, he did just fine." (TR. 3022.) Even Creque's "speed of processing information" was not impaired. (TR. 3003.) Considering Dr. Walker's

116

testimony, Creque's critique of the timing of the testing is of no merit because had Dr. Walker been engaged before trial and testified earlier, her testimony was still that he did not have an <u>Atkins</u> defect and, thus, any deficiency in the timing would not meet the <u>Strickland</u> standard of prejudice, which requires a reasonable probability of a different result. <u>See, e.g.</u>, <u>Wilson v. State</u>, [Ms. CR-21-0109, Aug. 22, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025) ("Although Wilson makes the bare allegation that, if his counsel had 'timely' filed the motion, then 'the motion would have been granted,' Wilson does not plead any facts as to how the trial court's merits analysis would have differed had his counsel filed the motion earlier."). Finally, "'"[d]efense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire."'" <u>White v. State</u>, 343 So. 3d 1150, 1176 (Ala. Crim. App. 2019) (quoting <u>McMillan v. State</u>, 258 So. 3d 1154, 1177 (Ala. Crim. App. 2017), quoting in turn <u>Darling v. State</u>, 966 So. 2d 366, 377 (Fla. 2007)). Creque's contentions were, thus, insufficiently pleaded and without merit.

## V.   "Legal Errors" by the Circuit Court

Creque concludes his brief on appeal with additional contentions of error he believes the circuit court committed:

> "(1) finding Creque was required to prove his case at the pleading stage; (2) finding this Court's prior decision on Creque's direct appeal was dispositive of his Rule 32 claims; (3) failing to rule on every claim; (4) denying Creque's request for discovery; and (5) refusing an evidentiary hearing."

(Creque's brief, p. 91.) Creque's contentions of error are each without merit.

Creque's first contention -- that the circuit court improperly dismissed his petition for lack of proof rather than a lack of sufficient pleading -- is refuted by the record. We have reviewed the circuit court's order, and it is abundantly clear that Creque's claims were properly dismissed because he failed to plead facts that, if true, would entitle him to relief. For example, Creque alleges that the circuit court conflated pleading and proof by taking the following out of context: that he " 'fail[ed] to overcome the presumption that … the challenged action might be considered sound trial strategy." (Creque's brief, p. 93 (citing C. 773-75, 778-84).) However, the circuit court's order makes it clear that the circuit court was not finding insufficient proof but insufficient pleading

based on the preceding sentences: "<u>The Petitioner fails to provide sufficient facts or allegations that if such evidence was presented, there is a reasonable probability that the outcome of the proceedings would have been different.</u>  The Petitioner fails to overcome the presumption that, under circumstances, the challenged action might be considered sound trial strategy." (C. 773 (emphasis added).)  Moreover, this Court may affirm for any reason, and we have already held herein that all of Creque's claims were insufficiently pleaded, without merit, or both.

Second, Creque's contention that the circuit court found that claims that had been rejected on direct appeal "'automatically foreclose[d] a determination of the existence of the prejudice required under <u>Strickland</u> to sustain a claim of ineffective assistance of counsel,'" (Creque's brief, p. 94 (quoting <u>Ex parte Taylor</u>, 10 So. 3d at 1079)), is waived under Rule 28(a)(10) because Creque cites the entire circuit court's order dismissing his petition and does not point to any specific examples.  Moreover, Creque's claim is without merit.  The circuit court did not find that any claims rejected on direct appeal automatically foreclosed an ineffective-assistance-of-counsel claim involving the underlying claim.  Instead, the circuit court recognized that "[t]he Petitioner bears the burden of

pleading facts that, if true, would entitle him to relief." (C. 765.) The circuit court also generally stated that Creque's petition did not sufficiently "allege that his counsel's representation fell below an objective standard of reasonableness or that the Petitioner was prejudiced as a result of trial counsel's deficient representation." (C. 766.) The circuit court then repeatedly rejected Creque's insufficiently pleaded claims. For example, the circuit court rejected Creque's claim "that trial counsel failed to engage an expert to testify about [his] drug use and its effect on his mens rea and ability to waive Miranda rights," explaining:

> "[Creque's trial] counsel did present evidence of [Creque's] use of Ativan and its use. The Appeals Court addressed such testimony. [Creque] fails to plead what additional or other facts or opinion could be offered which would have not been cumulative. Under such circumstances, the Petition fails to contain sufficient pleadings to allege that trial counsel's representation fell below an objective standard of reasonableness or that [Creque] was prejudiced as a result of trial counsel's deficient representation.
>
> "Additionally, this issue was concluded by the Appeals Court in its determination that the Petitioner made his statement freely and voluntarily, and nothing indicated he was impaired by Ativan."

(C. 767-68.)

120

Clearly, although the circuit court considered that the appellate court had rejected the underlying claim on the merits, the circuit court did not automatically reject the ineffective-assistance claim but, rather, found that Creque had not pleaded additional facts or opinion that would not have been cumulative and had not pleaded facts to show that Creque was prejudiced. As we have already explained herein, the Alabama Supreme Court made clear that, although a holding of no plain error on direct appeal will not "automatically foreclose" a finding of prejudice under Strickland, it is "the rare case in which the application of the plain-error test and prejudice prong of the Strickland test will result in different outcomes." Ex parte Taylor, 10 So. 3d at 1078. And, Creque simply did not plead any facts to show that his claims presented the "rare case." White, 343 So. 3d at 1184. Moreover, nothing in Creque's brief on appeal suggests that the circuit court's findings were in error. As already stated, Creque alleges only a general argument and has failed to point to a specific example where the trial court's finding was in error.

Third, Creque argues that the circuit court erred by not specifically addressing every contention within every claim in its order summarily

dismissing his petition, specifically his allegations that trial counsel were ineffective for

> "(1) failing to present evidence from lay witnesses regarding Creque's mental state on the night of the offense, (2) failing to investigate Cassandra Eldred; (3) failing to provide Dr. Kalin with relevant evidence until the day of his testimony; (4) selecting an expert, Dr. Kalin, who likely did not want to represent Creque; (5) incorrectly engaging a forensic toxicologist instead of a clinical toxicologist; and (6) failing to have Creque evaluated to determine whether an Atkins challenge or similar defense could be raised."

(C. 96-97.)

Creque's reliance on Borden v. State, 891 So. 2d 393, 397 (Ala. Crim. App. 2002) and Henderson v. State, 570 So. 2d 879, 880-81 (Ala. Crim. App. 1990) in support of his argument that neither he nor this Court could "determine -- with clarity -- the basis for the dismissal of each claim in the petition" is misplaced. (Creque's brief, p. 96.) In Borden, the State "did not seek to dismiss allegations of ineffective assistance of counsel." 891 So. 2d at 395. However, the circuit court in Borden stated that it was granting the State's motion to dismiss Borden's ineffective-assistance-of-counsel claims. Id. In addition, the circuit court "appear[ed] to have misapprehended Borden's burden at the pleading stage." Id. at 396. For both reasons, this Court remanded for

clarification. Moreover, this Court's "review of the record" did "not suggest that dismissal ... would have been proper." Id. Similarly, in Henderson, the State requested that Henderson's petition be dismissed as successive, but the circuit court did not grant that motion "but found the petition to be 'without merit' and denied the petition." 570 So. 2d at 880. In short, the circuit court's basis for denying the petition was not clear in Henderson, and "basis is essential to afford the petitioner due process on his appeal of the denial of his petition." Id. at 880.

By contrast, the circuit court in this case was clear that it was dismissing all of Creque's ineffective-assistance-of-counsel claims because they were insufficiently pleaded, regardless of whether the court addressed every single contention within Creque's numerous claims:

> "[T]he Court is satisfied that [Creque] has neither pleaded his claims with sufficient specificity nor supported his claims with a credible factual basis that entitles him to an evidentiary hearing. No purpose would be served by further proceedings in this case. ... [Creque's] claims fail the Strickland requirements in that they failed to show that trial counsel's representation fell below an objective standard of reasonableness, that trial counsel's actions might be considered sound trial strategy, and that they fail to set out a full disclosure of the facts."

(C. 784-85.) In addition, unlike in Borden and Henderson, the State sought to summarily dismiss all of Creque's ineffective-assistance claims

123

as <u>insufficiently pleaded</u>, including the six specific claims that Creque says the reason for the circuit court's summary dismissal is unclear. (C. 645 (lay witnesses who could have testified regarding mental state), C. 605-06 (investigation of Eldred), C. 609-10, 619-47 (allegations regarding Dr. Kalin), (C. 621-22, 643-44, 670-71 (allegations regarding a clinical toxicologist), and C. 673-74 (claim regarding cognitive testing and abilities)). As the circuit court held, "[t]he entirety of Creque's petition challenges the effectiveness of trial counsel's representation. … He avers that he was denied effective assistance throughout the guilt and penalty phases. His claims should be summarily dismissed as insufficiently pleaded under Rules 32.3 and 32.6(b)." (C. 597-98.) And, as already stated, the circuit court did not here confuse the burden of pleading and the burden of proof. Furthermore, this Court, after reviewing Creque's petition in light of the record, agrees with the circuit court that all of Creque's claims are insufficiently pleaded, without merit, or both.

Fourth, Creque's contention that the circuit court erred by denying his discovery request is also without merit. "'"We will reverse a [circuit] court's denial of a postconviction discovery request only for an abuse of discretion."'" <u>Jackson v. State</u>, 910 So. 2d 797, 802 (Ala. Crim. App.

124

2005) (quoting <u>Ex parte Mack</u>, 894 So. 2d 764, 768 (Ala. Crim. App. 2003), quoting in turn <u>People v. Johnson</u>, 205 Ill. 2d 381, 793 N.E.2d 591, 275 Ill. Dec. 820 (2002)). Moreover, "'"[a] trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding and amounts to a 'fishing expedition.'"'" <u>Id.</u> (citations omitted). It is equally well settled that, "[w]hen ascertaining whether discovery is warranted in a [postconviction] proceeding, the court must first determine whether the … petitioner has shown good cause for disclosure of the requested materials." <u>Jackson</u>, 910 So. 2d at 801 (citing <u>Ex parte Land</u>, 775 So. 2d 847 (Ala. 2000)).

The circuit court did not abuse its discretion by denying Creque's discovery request because Creque did not demonstrate "good cause" for discovery. A "good cause" determination necessarily requires consideration of <u>sufficiently pleaded</u> issues in a filed petition because postconviction discovery is not intended to support a "fishing expedition" but is, rather, "a means of vindicating actual claims." <u>Ex parte Land</u>, 775 So. 2d at 852, <u>overruled on other grounds</u>, <u>State v. Martin</u>, 69 So. 3d 94 (Ala. 2011). See also <u>Morris v. State</u>, 261 So. 3d 1181, 1202 (Ala. Crim.

125

App. 2016) ("Good cause" cannot be shown for claims that are "insufficiently pleaded, procedurally barred, or meritless."). Because "[w]e have held in the previous sections of this opinion that the circuit court did not err by summarily dismissing [Creque's] claims," "it follows that [Creque] did not meet the good-cause standard for obtaining postconviction discovery." Id. Thus, the circuit court did not abuse its discretion by denying Creque's postconviction discovery requests.

Creque's last contention -- that the circuit court erred by dismissing his claims without an evidentiary hearing -- is equally meritless. "Neither this Court nor the Alabama Supreme Court has ever held that an evidentiary hearing must be conducted on every postconviction petition that raises a claim of ineffective assistance of counsel. Such a requirement would burden an already overburdened judiciary." Jackson v. State, 133 So. 3d 420, 444 (Ala. Crim. App. 2009). Rather, "'"[a]n evidentiary hearing on a coram nobis petition [now Rule 32 petition] is required only if the petition is 'meritorious on its face.'"'" Id. at 444-45 (quoting Moore v. State, 502 So.2d 819, 820 (Ala.1986), quoting in turn Ex parte Boatwright, 471 So.2d 1257 (Ala.1985)). We have also explained that "[t]he purpose of a Rule 32 evidentiary hearing is to give a petitioner

the opportunity to satisfy his or her burden of proof as to claims that were properly raised and <u>sufficiently pleaded</u> in a Rule 32 petition." <u>Travis v. State</u>, 407 So. 3d 325, 339 (Ala. Crim. App. 2023). Because Creque's claims were insufficiently pleaded, refuted by the record, or otherwise without merit, he was not entitled to an evidentiary hearing. Accordingly, the circuit court did not err by summarily dismissing all of Creque's claims, including his ineffective-assistance-of-counsel claims, without an evidentiary hearing.

Finally, we note that, to the extent that Creque raised any claims in his petition that he did not reassert in his brief on appeal, those claims are deemed abandoned. "We will not review issues not listed and argued in brief." <u>Brownlee v. State</u>, 666 So. 2d 91, 93 (Ala. Crim. App. 1995). We further note that Creque's attempts to cure the waiver of arguments in his reply brief fail. "'Where an appellant first cites authority for an argument in his reply brief, it is as if the argument was first raised in that reply brief, and it will not be considered.'" <u>Moore v. Mikul</u>, 359 So. 3d 274, 278 (Ala. 2022) (quoting <u>Steele v. Rosenfeld, LLC</u>, 936 So. 2d 488, 493 (Ala. 2005)). In short, "'"an argument may not be raised, nor may

an argument be supported by citations to authority, for the first time in an appellant's reply brief."'" Id. (citations omitted).

Conclusion

For these reasons, Creque is due no relief on his postconviction claims, and the judgment of the circuit court summarily dismissing his postconviction petition is affirmed.

AFFIRMED.

Minor and Anderson, JJ., concur. Windom, P.J., and Kellum, J., concur in the result.